UNITED STATES, Appellee,

v.

Specialist John S. STONEMAN, United States Army, Appellant.

ARMY 9800137.

U.S. Army Court of Criminal Appeals.

21 Dec. 2000.

Captain Angelines McCaffrey, JA (on brief); Lieutenant Colonel David A. Mayfield, JA; Captain David S. Hurt, JA.

For Appellee: Captain Paul T. Cygnarow-icz, JA (argued); Colonel Russell S. Estey, JA (on brief); Major Anthony P. Nicastro, JA.

Before TOOMEY, Senior Judge, CARTER, and NOVAK, Appellate Military Judges.

## OPINION OF THE COURT

NOVAK, Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of rape of a female under the age of sixteen years and forcible sodomy upon a female under the age of sixteen years, in violation of Articles 120 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 925 [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for seventy-eight months, forfeiture of all pay and allowances, and reduction to Private E1.

In his Article 66, UCMJ, 10 U.S.C. § 866, appeal, the appellant claims that the military judge erred by not staying the proceedings after the appellant raised allegations that the members of his court-martial had been subjected to unlawful command influence; that the military judge failed to shift to the government the burden of disproving unlawful command influence after the appellant produced sufficient evidence to raise the issue; and that the military judge incorrectly concluded that the members were not unlawfully influenced by the brigade commander's electronic messages and briefing. We find no error materially prejudicial to the substantial rights of the appellant. UCMJ art. 59(a), 10 U.S.C. § 859(a).

## FACTS

The appellant was a member of Headquarters and Headquarters Company, 1st Battalion, 17th Infantry, a subordinate unit of the

For Appellant: Captain Daniel E. Goldman, JA (argued); Colonel Adele H. Odegard, JA; Major Jonathan F. Potter, JA;

1st Brigade, 6th Infantry Division (Light).[1] On 21 December 1997, Colonel (COL) Brook, the 1st Brigade commander and the special court-martial convening authority for the appellant's unit, sent an electronic message [hereinafter "first e-mail"] to the brigade leadership and to supporting unit commanders, notifying them of mandatory leaders' training on 23 December 1997 at the post theater. (Appendix I). The e-mail expressed, inter alia, COL Brook's intent to "[d]eclare war on all leaders not leading by example":

> If leaders don't lead by example, and practice self-discipline, then the very soul of our Army is at risk. No more [platoon sergeants] getting DUI[']s [caught driving under the influence], no more NCO[']s [noncommissioned officers] raping female soldiers, no more E7[']s coming up "hot" for coke, no more stolen equipment, no more "lost" equipment, no more approved personnel actions for leaders with less than 260 APFT [Army physical fitness test scores], no more leader APFT failures at DA [Department of the Army] schools,— all of this is BULLSHIT, and I'm going to CRUSH leaders who fail to lead by example, both on and off duty.

During the 23 December 1997 leaders' training, COL Brook reiterated his concerns about leadership within the brigade. On 9 January 1998, apparently after consultation with the staff judge advocate (SJA),[2] COL Brook sent a second e-mail to the brigade leadership, in which he "clarified" the comments he made in the first e-mail and at the leaders' training. (Appendix II). He emphasized that nothing in his previous message was intended to suggest a specific course of action that commanders were to take in any particular case. All commanders were expected to handle each case appropriately, and "[a]ppropriate action [was defined as] what each individual commander, be it [battalion] or [company], deem[ed] so in the exercise of independent discretion." Colonel Brook further advised that:

> Nothing in what I have said in this or the earlier e-mail, or what I said at the Leader Training, has anything to do with what any soldier does as a member of a court-martial panel or as a witness before a court-martial. The sworn duty of any court-martial panel member is to follow the instructions of the military judge, apply law to admissible facts, and decide a sentence based solely on the evidence presented in court. Nothing said outside a court-martial by anybody, TO INCLUDE ME, may have any bearing on the outcome of any given case or sentence.

On 22 January 1998, the appellant's defense counsel raised a pretrial motion to stay the court-martial proceedings until all 1st Brigade members were removed from the panel. The defense counsel argued that all 1st Brigade members were impliedly biased because of COL Brook's comments, and proferred the expected testimony of a 1st Brigade NCO who took from the leaders' training the message that any soldier in 1st Brigade who got in trouble was to be "crushed." The defense counsel conceded that his claim of unlawful command influence only applied to panel members from 1st Brigade, and not to potential witnesses. The military judge ruled that the defense request for a stay was premature, that COL Brook's e-mails did not automatically disqualify any panel members, and that any unlawful command influence issues could be addressed during individual voir dire. During group voir dire at the appellant's 25–27 January 1998 trial, in response to the military judge's general question, five of the nine members acknowledged seeing an e-mail regarding possible disciplinary problems within the Brigade.

---

1. We take judicial notice of the fact that approximately 4600 soldiers are stationed at Fort Wainwright, Alaska. *www.wainwright.army.mil/fwapage/fwapage.htm.* The major unit at Fort Wainwright is the former 1st Brigade, 6th Infantry Division (Light), which was redesignated as the 172nd Infantry Brigade (Separate) on 17 April 1998. *Id.; www.wainwright.army.mil/1bde/history.htm.* The 172nd Infantry Brigade has an authorized strength of 3809 soldiers, the vast majority of whom are assigned to Fort Wainwright, and is supported by other units at Fort Wainwright. *www.wainwright.army.mil/1bde/welcome.htm.*

2. The SJA was not an addressee to the first e-mail, but was to the second e-mail.

The first member individually questioned was Lieutenant Colonel (LTC) Saul, who was rated by COL Brook and served as the acting brigade commander in COL Brook's absence. Lieutenant Colonel Saul saw both e-mail messages and attended the leaders' training. He thought that the first e-mail was directed at all enlisted soldiers in the brigade and that it suggested an "appearance of a lack of law and order and discipline among certain elements of the brigade." He described the leaders' training as follows:

[A] discussion, a monologue from the brigade commander, in regards that a series of criminal acts or violations of the law, to include a number of driving under the influence or drunk driving cases; there was reference to a rape of a female enlisted soldier by a noncommissioned officer; some details were discussed in that case; and a general perception on the part of the brigade commander was that there was an element within the brigade that violation of the law was common.

Lieutenant Colonel Saul stated that the only guidance given as to what types of actions should be taken on cases was a general "tightening up of the chain of command and enforcement of discipline and standards." He said that he did not think that COL Brook's message would have any impact on his performance as a court member.

The second member, LTC Withers, who was COL Brook's executive officer, saw both e-mails and attended the leaders' training. Lieutenant Colonel Withers stated that the first e-mail focused on discipline problems within the brigade, and encouraged all leaders not to accept substandard performance. He said that although the leaders' training covered the same subject matter and encouraged leaders to "pick up the standards," COL Brook especially emphasized the problems the brigade was having with drunk driving incidents. Lieutenant Colonel Withers described the second e-mail as clarifying the original statement that COL Brook had made about "squash[ing] people who did something wrong," and as emphasizing that any previous statement was not intended "to inhibit [COL Brook's] subordinates in the proper handling of UCMJ and other legal matters."

As to the impact that COL Brook's message could have on his performance as a panel member, LTC Withers stated:

Colonel Brook is a very impassioned man; he holds his values very high; he shoots from the hip; he knows he shoots from the hip. I had talked to him about that and a wide variety of subjects. I've been in the Army long enough to have seen statements like that before; and quite frankly I've been in the Army so long that I'm not really concerned at this point what my rater thinks; I'm going to do what I think is right, because that's what I've done all my career.

The third member, LTC Moody, commanded an aviation battalion that supported, but was not part of, 1st Brigade. Lieutenant Colonel Moody stated that he probably received COL Brook's first e-mail because he is normally on the courtesy line of most brigade correspondence. While he only recalled that the message "may have had something to do with accountability [or] integrity," he said, "[A]gain, Colonel Brook, I respect him, but he's not my brigade commander." Lieutenant Colonel Moody was invited to the leaders' training, but he did not attend.

The fourth member, Command Sergeant Major (CSM) Pagan, was the command sergeant major for 1st Brigade. He recalled receiving the first e-mail message, but he did not play any role in drafting it. In fact, he said that although COL Brook's intent was to describe potential problem areas and to encourage leaders to prevent their soldiers from getting into trouble, especially over the holiday period, "[COL Brook] probably overreacted and put it on e-mail. He shot from the hip, versus talking to somebody else and maybe let them, kind of, see what he was writing and maybe say 'Hey, sir, you need to calm that down a little bit.'" Command Sergeant Major Pagan added that the message was not intended to tell leaders what actions they should take when confronted with a soldier in trouble. Command Sergeant Major Pagan stated that he did attend the leaders' training, but that he did not specifically recall seeing COL Brook's second e-mail. When asked by the military judge how he could assure a spectator in the court-

room that he would be a fair and impartial court member, CSM Pagan replied:

Well, I've been a fair and impartial member of the United States Army, as well as my nation, serving for close to 25 years; and I'm not one to be swayed, I'm not one to comply with something just because somebody else said it. I'll stick by my guns and come to the conclusion that I feel is appropriate; no matter who's in that group, or in this members [sic] of the jury; I will take all the information that's given to me, make a rational decision, evaluate all that information, and I will make the best decision that I see possible with that information, and listening to others that have an opinion on that subject.

The fifth member, Master Sergeant (MSG) Peele, was the 1st Brigade Chemical NCO. He received COL Brook's first e-mail and attended the leaders' training. Master Sergeant Peele stated that the message was primarily focused on problems the brigade was having with drunk driving. He did not view COL Brook's message as giving any guidance on what he should do as a leader. When asked if COL Brook's message in any way affected his duties as a court member, MSG Peele replied that he did not "need a Colonel to tell [him] how to do [his] duties," and that COL Brook "could take a message from [him]." MSG Peele thought the brigade should focus on issues more important than drunk driving, citing racism as one example. When the defense counsel asked MSG Peele if COL Brook's message to crush all leaders who do not lead by example would affect him, MSG Peele replied:

Well, if you're doing your job, sir, everyday like you should be doing, as I do, I feel it had no affect on me. It does affect me to the point of you can't tell me to lead by example if you don't do it; and that's just my opinion, sir.

. . .

[COL Brook] talked about the NCO creed and the values and things like that; and he cannot sit there and interrogate and demand that we operate by a set of values that I feel like he's not operating off of, sir.

A sixth member, Sergeant First Class Robbins, who was a member of the appellant's battalion, did not see either e-mail but did attend the leaders' training. Sergeant First Class Robbins said during individual voir dire that the focus of COL Brook's briefing was "DUI[']s, drug abuse, spouse abuse, and sexual harassment of subordinates." Sergeant First Class Robbins said that he did not think that COL Brook's briefing had any bearing on his duties as a court member.

At the conclusion of voir dire, the military judge denied the appellant's challenge against all 1st Brigade panel members for implied bias based on unlawful command influence, ruling:

I've read *United States versus Youngblood*, [47 M.J. 338 (1997)] and I certainly agree with the court in that case that implied bias is critical and it's reviewed through the eyes of the public; but if it was reviewed through the eyes of the public the responses that the court members gave, if members of the public were sitting in the back of the courtroom and heard their responses given on voir dire by the members of 1st Brigade who have been selected to serve in this court-martial, I think they would see that these members represent the finest traditions of the United States Army as court members, and would certainly not be swayed by anything Colonel Brook might say; they viewed his comments as being intemperate, and I think that everyone heard them say loudly and clearly that they will discharge their responsibilities as court members and vote in accordance with their conscience.

So on the issue of implied bias I find that the defense has not raised anything that would suggest that implied bias exists on the part of any of these court members, and there's been no offering of anything within the members of 1st Brigade generally, other than these court members who sat.

The defense counsel asserted challenges for cause against LTC Saul and CSM Pagan for actual bias, citing as one of the grounds for challenge their close working relationship with COL Brook and the impact of his message on their ability to impartially serve as

panel members. The military judge granted the challenge against LTC Saul, ruling:

In the interest of granting challenge[s] for cause liberally, based upon my observations as well of Lieutenant Colonel Saul, he was the only one that didn't take great pains to distance himself from Colonel Brook's comments; he was the .only one who believed that, I think, the message extended to all soldiers, including those at the Private level.

Although she denied so much of the defense challenge against CSM Pagan that related to COL Brook's e-mail message and briefing, based on the member's "candid," "[un]inhibited responses" and his "voic[ed]," "vehement[ ] disagree[ment] with Colonel Brook," the military judge ultimately granted a challenge for cause against CSM Pagan on a basis unrelated to the alleged command influence. The defense had no further challenges for cause, and peremptorily challenged MSG Geyer, the only noncommissioned officer who had no exposure to COL Brook's written or oral comments. Nothing further was mentioned on the record regarding the issue of unlawful command influence.

## LAW

The appellant's case involves the complicated interplay among the laws, standards, and cases governing challenges against court-martial members for implied bias on the one hand, and the issue of unlawful command influence on the other. As to the former, "both sides in a court of law are entitled to a panel of fair jurors, jurors who have not had any pressure put on them to be lenient or to be harsh." *United States v. Youngblood*, 47 M.J. 338, 343 (1997) (Sullivan, J., concurring in part and dissenting in part), *aff'd by summary disposition*, 52 M.J. 476 (1999). Thus, Rule for Courts–Martial 912(f)(1)(N) [hereinafter R.C.M.] provides that a court member "shall be excused for cause whenever it appears that the member ... [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." Rule for Courts–Martial 912(f)(3) provides that "[t]he burden of estab-

lishing that grounds for a challenge exist is upon the party making the challenge."

██ Rule for Courts–Martial 912 applies to challenges for implied bias as well as actual bias. *See United States v. Rome*, 47 M.J. 467, 469 (1998). Implied bias exists when, regardless of an individual member's disclaimer of bias, " 'most people in the same position would be prejudiced' [i.e., biased]." *See United States v. Daulton*, 45 M.J. 212, 216–18 (1996) (citation omitted). The general focus is " 'on the perception or appearance of fairness of the military justice system.' " *United States v. Schlamer*, 52 M.J. 80, 93 (1999) (citation omitted), *cert. denied*, 529 U.S. 1005, 120 S.Ct. 1270, 146 L.Ed.2d 219 (2000). In cases involving no actual bias, however, " 'implied bias should be invoked rarely.' " *United States v. Warden*, 51 M.J. 78, 81–82 (1999) (citation omitted); *see also United States v. Lavender*, 46 M.J. 485, 489 (1997).

██ The United States Court of Appeals for the Armed Forces (CAAF) recently reiterated the standards for appellate review of court member challenges:

This Court will not overturn a military judge's denial of a challenge for cause unless there is a clear abuse of discretion by the judge in applying the liberal-grant policy. More particularly, the military judge is given great deference when deciding whether actual bias exists because it is a question of fact, and the judge has observed the demeanor of the challenged member. Less deference is given to the military judge's determination when this Court is reviewing a finding on implied bias because it is objectively "viewed through the eyes of the public."

*United States v. Napolitano*, 53 M.J. 162, 166 (2000) (citations omitted).

The second area of law involved in the appellant's case is that of unlawful command influence. Article 37, UCMJ, provides that "[n]o person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member

thereof, in reaching the findings or sentence in any case." [3]

■ Our superior court reaffirmed in *United States v. Biagase,* 50 M.J. 143 (1999), that the defense has the initial burden of raising the issue of unlawful command influence at trial by showing "facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Biagase,* 50 M.J. at 150. The threshold for raising the issue at trial is low, but it is more than mere allegation or speculation. *United States v. Johnston,* 39 M.J. 242, 244 (C.M.A.1994). " 'Proof of [command influence] in the air, so to speak, will not do.' " *United States v. Allen,* 33 M.J. 209, 212 (C.M.A.1991) (alteration in original) (citations omitted). On appeal, the defense's initial burden is similar—"the defense must (1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that unlawful command influence was the cause of the unfairness." *Biagase,* 50 M.J. at 150; *see also United States v. Levite,* 25 M.J. 334, 341 (C.M.A.1987) (Cox, J., concurring).

■ Once the issue of command influence is sufficiently raised at trial or on appeal, "the appearance or existence of unlawful command influence creates a rebuttable presumption of prejudice." *United States v. Wallace,* 39 M.J. 284, 286 (C.M.A.1994). The burden then shifts to the government to "prove beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings [at trial] or did not affect the findings and sentence [on appeal]." *Biagase,* 50 M.J. at 151.

■ "Where the issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed [by an appellate court] under a clearly-erro-

neous standard, but the question of command influence flowing from those facts is a question of law that this [c]ourt reviews *de novo.*" *Wallace,* 39 M.J. at 286, *cited with approval in United States v. Johnson,* 54 M.J. 32, 34 (2000). In *United States v. Reynolds,* 40 M.J. 198 (C.M.A.1994), our superior court defined what it means, in an appellate context, to "show" that the proceedings were unfair because of unlawful command influence. The court held that prejudice is not presumed until the defense produces evidence of proximate causation between the acts constituting unlawful command influence and the outcome of the court-martial. *Id.* at 202. If unlawful command influence is found, "no reviewing court may properly affirm [the] findings and sentence unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *United States v. Thomas,* 22 M.J. 388, 394 (C.M.A.1986).

The issue of unlawful command influence becomes more complicated when it is applied to court-martial panel members who are challenged on the basis of implied bias. *See Youngblood,* 47 M.J. at 341. Two cases assist our analysis. *Thomas* tells us:

In determining whether an accused's trial in a contested case before court members was adversely affected by command influence, ... we place the burden upon both defense and trial counsel, as well as the military judge, to fully question the court members during voir dire and to determine thereby whether any of the members had knowledge of the commander's comments and, if so, whether the comments had an adverse impact on the member's ability to render an impartial judgment. When required, witnesses may be called to testify on this issue. However, we are not prepared to disqualify members of a court-martial panel simply because they were assigned or were in close proximity to the command where the comments were made. To do so would ignore the members' oath to adhere to the

---

**3.** The government has not claimed that the exception in Article 37, UCMJ, which allows "general instructional or informational courses in military justice ... designed solely [to] instruct[ ]

members of a command in the substantive and procedural aspects of courts-martial" applies in this case. UCMJ art. 37(a).

military judge's instructions and to determine the facts in accordance therewith. *Thomas,* 22 M.J. at 396 (citations omitted).

More recently, our superior court decided the *Youngblood* case, upon which the military judge in the appellant's case relied. That case involved the remarks of the Brigadier General wing commander and his staff judge advocate (SJA) at a staff meeting which three of the panel members attended several days before trial. Those remarks included "illustrative examples of types of punishments and types of actions that commanders had taken." *Youngblood,* 47 M.J. at 340. The general commented that, in a recent case involving a subordinate commander who had "shirked his or her leadership responsibilities" by "underreact[ing]" to an incident of child abuse, he had "forwarded a letter to that commander's new duty location expressing the opinion that 'that officer had peaked.'" *Id.* A majority of the CAAF resolved the issue of whether challenges should have been granted against the members because of unlawful command influence by scrutinizing the members' answers during voir dire and applying the standards of review outlined above for causal challenges. They focused on the message the members perceived, its proximity in time to the court-martial, and the specificity of the threat to the members' careers. *Id.* at 341–42.

## DISCUSSION

### Stay of the Proceedings

 The appellant complains that once he filed his motion raising the possibility of unlawful command influence, the military judge should have stayed the proceedings until the convening authority selected a panel of members who were not part of the 1st Brigade. We reject the appellant's argument that a military judge must stay proceedings pending appointment of a new panel after a mere allegation of unlawful command influence against some members of the panel has been raised. The voir dire process was well suited for determining, as the military judge did here, which members saw either of the e-mail messages or attended the leaders' training and what impact COL Brook's com-

ments had on the members' ability to render an impartial judgment. *See Thomas,* 22 M.J. at 396. Accordingly, the military judge did not err by declining to stay the appellant's court-martial until a new panel was selected.

### Implied Bias

 When we review a military judge's denial of challenges for cause based on implied bias, the military judge is entitled to less deference than she is afforded for challenges based on actual bias. *See Napolitano,* 53 M.J. at 166. By statute, members are automatically disqualified because of potential bias when they are accusers or witnesses for the prosecution, or when they have acted as investigating officers or counsel in the same case. UCMJ art. 25(d)(2), 10 U.S.C. § 825(d)(2); *cf. United States v. Tittel,* 53 M.J. 313, 314 (2000) (recognizing that a convening authority who is an accuser in a court-martial arguably cannot be neutral enough to convene that court-martial). The Supreme Court has recognized "exceptional" or "extreme situations" where bias may be implied, such as when a juror is "an actual employee of the prosecuting agency, . . . a close relative of one of the participants in the trial or the criminal transaction, or . . . a witness or somehow involved in the criminal transaction." *Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring). Our superior court has also recognized that challenges based upon implied bias should only be granted in rare circumstances. *See Warden,* 51 M.J. at 81; *Lavender,* 46 M.J. at 489. The *Youngblood* decision appears nevertheless to have expanded implied bias to include cases where the commander is admittedly not attempting to coerce or influence the actions of a court-martial member under Article 37, UCMJ, but is only making "remarks . . . directed at the commander's role in initiating disciplinary action rather than an officer's role as a member of a court-martial." *Youngblood,* 47 M.J. at 342.

We conclude that COL Brook's remarks in the appellant's case do not meet even the low threshold established by *Youngblood.* First, the thrust of the remarks was not to explain appropriate punishments for various crimes,

but to improve leadership behavior by eliminating NCO DUI's, encouraging leaders to set a good example, and directing leaders to incorporate single and new soldiers into unit activities.[4] Second, the initial e-mail and the pre-holiday leaders' training occurred more than one month before trial. *Cf. Youngblood*, 47 M.J at 339 (questionable remarks made several days before trial); *Brice*, 19 M.J. at 171, 172 n. 3 (prejudicial remarks made in the middle of appellant's trial). Third, the SJA was neither allegedly nor implicitly involved in either the first e-mail or the leaders' training. *Cf. Youngblood*, 47 M.J. at 342 (SJA participated in the commander's briefing). Fourth, the relatively anonymous audience consisted of all officers and noncommissioned officers, including corporals, in the brigade. *Cf. Youngblood*, 47 M.J. at 339 (comments made at a staff meeting).

In addition to the circumstances of COL Brook's comments and their contents, we have analyzed the members' comments during individual voir dire,[5] where they indicated that instead of fearing for their careers based on their performance as court members, they regarded COL Brook's comments as an intemperate attempt to restore discipline in the brigade. In determining their credibility, we have focused on the message they perceived, *see Youngblood*, 47 M.J. at 341 ("The perceived message rather than the actual message ... controls ...."), mindful of how difficult it is to review a member's assessment of his own bias.[6] Weighing the members' qualifications,[7] statements during voir dire, seniority, and positions in the brigade, we are satisfied that they were not subject to the "subtle pressures" so feared in *Youngblood* in reaching a verdict on the find-

4. The only comment related to specific disciplinary action was the directive in the first e-mail that battalion and company commanders "[c]ounsel [leaders] and inform them that continued failure to lead by example will result in relief, negative [efficiency reports], or UCMJ action." The only other comment that could even be alleged to refer to the appellant's case was the phrase, "no more NCO[']s raping female soldiers," buried in the list of the types of misbehavior that COL Brook did not want to see repeated. We do not find that this comment referred to, or was considered by the members to refer to, the appellant's case. *Compare Youngblood*, 47 M.J. at 340, 342 (briefing involved "illustrative examples of types of punishments and types of actions that commanders had taken," presenting a "specific" "threat" to the members' careers) *and United States v. Brice*, 19 M.J. 170, 171 (C.M.A. 1985) (Marine Corps Commandant opined at meeting that drug traffickers should be "out" of military service) *with United States v. Martinez*, 42 M.J. 327, 331–32 (1995) (letter announcing a "get tough on DUI cases" policy, which was circulated eight days before the appellant's trial for negligent homicide by drunk driving, "conveys no express or implied message that appellant ... should be found guilty without regard to the evidence presented at a court-martial[, nor is it] directed at th[e] court-martial to ensure ... severe punishments").

5. We note that the relatively small panels and uncrowded dockets of the military justice system support leisurely individual voir dire, which in turn encourages candor. *Cf. Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (noting that, although a juror may be sincere when he says that he will be fair and impartial to the defendant, the "psychological

impact requiring such a declaration before one's fellows is often its father.").

6. *Compare Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 94 L.Ed. 734 (1950) ("One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.") *and United States v. Nigro*, 28 M.J. 415, 418 (C.M.A.1989) ("[A] member's unequivocal statement of a lack of bias can ... carry weight."), *with Crawford v. United States*, 212 U.S. 183, 196, 29 S.Ct. 260, 53 L.Ed. 465 (1909) ("Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one ... who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence."); *and United States v. Gerlich*, 45 M.J. 309, 313 (1996) (recognizing "the difficulty of a subordinate ascertaining... the actual influence a superior has on that subordinate."); *see generally Smith v. Phillips*, 455 U.S. at 236, 102 S.Ct. 940 ("A juror will be less reluctant to admit that he was disturbed or upset by the misconduct of a third party, than to admit that he himself acted improperly.").

7. *See* UCMJ art. 25(d)(2) ("[T]he convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament."); *see also United States v. Tulloch*, 47 M.J. 283, 287 (1997).

ings or in adjudging a sentence in the appellant's case. *Youngblood*, 47 M.J. at 342.

Accordingly, based on the entire record before us, we conclude that the military judge did not abuse her discretion in holding that the members who were exposed to any of COL Brook's comments could nevertheless render an impartial verdict in the appellant's case, and that members of the public viewing this court-martial would perceive the military justice system as fair and impartial.

### Unlawful Command Influence and Burden Shifting

■ The appellant complains that the military judge failed to shift the burden of proof to the government after he raised evidence of unlawful command influence. He also challenges, based on command influence case law, the military judge's decision that the members who belonged to the 1st Brigade were qualified to sit on his court-martial. The form and content of the military judge's disputed rulings are a product of the judge's reliance on the *Youngblood* decision, which resolves the member challenge issue based on implied bias without ruling on the unlawful command influence issue. Neither the majority nor the two minority opinions in *Youngblood* reconcile the conflicts between the precedents involving member challenges and those addressing unlawful command influence. That is, *Youngblood* does not reconcile the defendant's burden of proof to justify a challenge under R.C.M. 912(f)(3), with the government's burden, once unlawful command influence is sufficiently raised, to disprove the influence or its effect on the trial. Furthermore, the opinion uses the abuse of discretion standard of review for challenges, without commenting on the applicability of the *de novo* standard for review of unlawful command influence. Finally, *Youngblood* does not address whether the military judge should couch any rulings on challenges for cause using the language normally expected in command influence cases, *i.e.*, announcing whether unlawful command influence was raised and the burden of proof had shifted to the government, and whether the government had met its burden to disprove the command influence or disprove its influence

on the court-martial beyond a reasonable doubt. We will thus examine the military judge's rulings on unlawful command influence in light of *Youngblood's* limited guidance.

First, the military judge never articulated whether, under command influence law, the appellant had met his initial burden to show facts constituting unlawful command influence that were logically connected to the court-martial, and which had the potential to cause unfairness in the proceedings, thereby shifting the burden of proof to the government. *See Biagase*, 50 M.J. at 150. Instead, her conclusion that "the defense [did] not raise[ ] anything that would suggest that implied bias exist[ed] on the part of any of the[ ] court members" appears to be based purely on the law of causal challenges. We are hard pressed to find prejudice from this omission, however, because the trial proceedings would not have been altered by any decision regarding unlawful command influence. Where, as here, the command influence challenge is against the members, *Thomas* allows a military judge to follow the regular trial script through voir dire.[8] The result is the same whether the members are considered to be defense witnesses for an initial showing of command influence, government witnesses to disprove any alleged influence, or neutral witnesses because the military judge has undertaken the burden to ferret out unlawful command influence in her role as the "last sentinel," *see United States v. Rivers*, 49 M.J. 434, 443 (1998)—the members appear not as individually sworn witnesses, but as regularly called members who undergo group and individual voir dire by the military judge and counsel. Thus, any burden shifting and presentation of evidence in the traditional sense would only occur, if at all, after voir dire is completed, when the military judge could offer counsel the opportunity to present additional evidence. Because a challenge against members based on unlawful command influence presents a procedural anomaly, we find the military judge committed no prejudicial error when she did not articulate under command influence case law whether the appellant had met his initial

---

8. U.S. Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook (30 Sept. 1996).

burden of production, and whether the burden of proof then shifted to the government.

■ Second, the military judge also did not make any specific findings of fact as to the content of the leader's training or conclusions of law as to whether COL Brook's comments constituted unlawful command influence. Once again, we do not consider these omissions to be critical to our analysis of whether the members were ultimately qualified to sit on the appellant's court-martial. As previously discussed, *Youngblood* reminds us that what was actually said is not as critical as what each member of the panel and the public perceived that COL Brook said and meant. Likewise, even had the military judge ruled on whether unlawful command influence occurred, and found that the brigade commander did not attempt to unlawfully influence the appellant's court-martial, she still would have had to determine if any of COL Brook's comments required the disqualification of a member. Her interpretation of the third prong the government must address under traditional unlawful command influence law (whether proven influence will prejudice the proceedings) would have had to result in a conclusion of law applicable to the language of the member disqualifications set out in R.C.M. 912.[9] In effect, any ultimate conclusion as to whether the trial was affected, *i.e.*, whether the members were disqualified, would have been cumulative to her conclusion that there was or was not implied bias. Given the majority opinion in *Youngblood*, and the lack of specific guidance in any of the opinions in that case, we decline to hold that the absence of findings of fact or conclusions of law regarding the existence of unlawful command influence requires reversal in this appellant's case.

■ Regardless of the sufficiency of the procedures the military judge used, we must conduct a *de novo* review of the record to determine whether the appellant's trial was tainted by unlawful command influence. *See*

*Wallace*, 39 M.J. at 286. We conclude that even if the appellant is considered to have met his initial burden of showing on appeal facts constituting unlawful command influence which could have caused unfairness in the court-martial proceedings, the members' responses during voir dire satisfy us that COL Brook did not "attempt to coerce or, by any unauthorized means, influence the action of … any member [of the appellant's court-martial] in reaching the findings or sentence in [his] case." UCMJ art. 37. We agree with the assessment of the members that COL Brook was "shoot[ing] from the hip," and that his language was intemperate. While COL Brook's comments may have been inappropriate to his disciplinary goals, we hold that his comments were not unlawful. After carefully reviewing the contents of both e-mail messages, we can point to no phrase or sentence that attempts to influence any potential court-martial members in their deliberations, either in the appellant's case or in any other case.

Even assuming, arguendo, that COL Brook's comments were an attempt to influence the appellant's court-martial, we are persuaded, for the reasons explained in the implied bias discussion above, that the government met its trial and appellate burdens under *Biagase*. We conclude beyond a reasonable doubt that the findings and sentence in the appellant's case were not affected by COL Brook's e-mails and leaders' training.

The remaining assignment of error, and those matters raised personally by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and not addressed above, are without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge TOOMEY and Judge CARTER concur.

## APPENDIX I

**From: 1BDE CDR (Brook, COL)**

Sent: Sunday, December 21, 1997 4:04 PM

---

9. *Compare Biagase*, 50 M.J. at 151 (holding that, if predicate facts exist, the government must show that they do not constitute unlawful command influence or that the influence will not affect the proceedings) *with* R.C.M. 912(f)(1)(N)

(providing that a member shall be excused whenever his presence would cast substantial doubt as to the legality, fairness, and impartiality of the court-martial).

**APPENDIX I**—Continued

**APPENDIX I**—Continued

To: 1 BDE CSM (Pagan CSM Carlos); 1/501 CDR (Cole, LTC Thomas); 1/501 CSM (Kelso, CSM); 1–17 BN CommandGrp(Okita, LTC); 1st Bde DCO (Withers, LTC G); 2–1 Inf CDR (Torres, LTC); 3rd ASOS (Bowers, LTC Kerry); 4–11 FA CDR (Saul, LTC L); 4–11 FA CSM (Jackson, CSM); 4–123 BN Cdr (Moody, LTC M); 46 SB BN CDR (Parker LTC); 46 SB CSM (Bahr, CSM); CDR FWA (Curry, LTC J); 1–17 BN ACoCdr(Vandenberg,C001; 1–17 BN B CoCdr (Stone CPT); 1–17 BN C CoCdr<Vermeesh,CP001; 1–17 BN HHC CoCdr(WilliamsCPT); 1–501 A Co CDR (Bieger CPT); 1–501 B Co CDR (Borowski CPT); 1–501 C Co CDR (Vanek CPT); 1–501 HQ CDR (Cummings CPT); 1BDE HHC CDR (Morgan, CPT); 2–1 A CO CDR (Palaza, CPT M); 2–1 B CO CDR (Mangin, CPT P); 2–1 C CO CDR (Robertson, CPT A); 2–1 HHC CDR (Ross, CPT Paul); 21 SIG CDR (McConnell, CPT R); 41 Eng C Co (Robertson, CPT R); 4–11 FA A Btry (Wagner, CPT B); 4–11 FA B Btry (Chapman,CPT K); 4–11 FA C Btry (Armsworth, T); 4–11 FA HHSB (Kilgallon J); 46 SB A Co CDR (Skrabacz,CPT); 46 SB B Co Cdr (Neasbitt,CPT); 46 SB C Co CDR (Brant CPT); 46 SB HHC Cdr (Hamlet, CPT B); 46 Sup D co CDR (Walker CPT); E3–17 CAV CDR (Mondelli, CPT); F/110 MI ABN DET (Chapman 1LT); F110 CDR (Scanlon, CPT Robert); LRSD CDR (Broek CPT Hal)

Cc: USARAK CofS (DeWitt, COL); USARAK DEP CDR (Brophy, COL B); 'L.K. Brook'; 1 BDE A/S1 (Burke,CPT Brenden); 1 BDE Asst. S3 (Kelley, CPT P); 1 BDE AsstS3 Plans (Schroeder); 1 BDE Automation (DeSilva CPT); 1 BDE CDR SEC <Ruiz, SGT); 1 BDE ChemOfc (McGuire,MAJ J); 1 BDE HHC 1SG (Glover, 1SG D); 1 BDE PMO (Hagan, CPT W); 1 BDE S1 (Agee, MAJ M); 1 BDE S2 Plans(Elliot,CPT); 1 BDE S3 (Hager, MAJ Gregory); 1 Bde SIB S3 Air (Baker,CPT C); 1 BDE XO (Thomas, MAJ Richard); 1/17 BN ExecOff <Davis, MAJ K>; 1/17th BN S3 (Carlson, MAJ R); 1/501 S1 (Lowell, CPT); 1/501 S3 (Johnson, MAJ); 1/501 S4 (Hadley, CPT); 1/501 SIGO (Moss, CPT Mark); 1/501 XO (Wood, MAJ Ward); 1–17 BN Chem Off (Larimer,2LT); 1–17 BN S1 (Vallely CPT); 1–17 BN S2 (Elliott, CPT); 1–17 BN S2 BICC (Karste 1LT); 1–17 BN S3 Air(Kammerzell CPT); 1–17 BN Sig Off (Burnett, CPT); 1–501 A 1SG (Barron, 1SG); 1–501 B Co 1SG (Painter 1SG); 1–501 BMO (CW2 Bridger, Rober); 1–501 Bn Ch (Watters CPT) 001; 1–501 C Co (Dunn, 1SG Dennis); 1–501 S2 (McAden, CPT Jamie); 1–501 Tng (Tonsmeire CPT) 001; 1BDE AWB S1 (Moran 2LT); 1BDE CHAP (Neetz MAJ); 1BDE ENG (Neidig CPT); 1BDE FSE TGT OFF(NeiningerCW2); 1BDE FSO (Goldman MAJ); 1BDE PAO (MEYER 1LT); 1BDE S2 OPRS OFCR(PotkovicCPT); 1BDE S3 SGT MAJ (Garner, SGM); 1BDE S3 TNG (Reherman, CPT); 1BDE S3 TNG NCO(Arsenault SGT); 1BDE S4 (Stover CPT); 1BDE S4 FOOD (Pisney, CW2); 1BDE S4 FOOD NCO (Roy, MSG); 1BDE S5 NCO (Head, SSG); 1st Bde BAMO (Harris, SFC); 1st Bde Sig Off (Snyder, CPT); 2–1 BN S1 Off (Harry, 1LT H); 2–1 BN S2 Off (CPT Parsons); 2–1 Inf OPS (Greany,CPT Peter); 2–1 INF S–4 (Habic, CPT Peter); 2–1 Inf XO (Patterson, MAJ M); 4–11 FA (Carns CPT James); 4–11 FA (Carswelf, CPT Bruce); 4–11 FA Chaplain (Brisson CPT); 4–11 FA Radar (Sigler, CW2); 4–11 FA S1 (Patterson, 1LT); 4–11 FA S2 (Waldrep, 1LT); 4–11 FA S–3 (Powell, MAJ T); 4–11 FA XO (Sweeny, MAJ P); 46 SB ASST S3 (Gulley, CPT); 46 SB BMMC OIC (Liberg MAJ); 46 SB BN XO (Gaslin MAJ); 46 SB Mtr Ofcr (Caudill, CPT J); 46 SB S1 (Pilarski, 1LT Carol); 46 SB S2 (Hetherington,2LT R); 46 SB S3 (Gitter, MAJ K); 46 SB SupOperOfcr (Doyle,CPT)

Subject: Mandatory Leader Training

Importance: High

Cdrs:

Tuesday, 23 Dec *all Leaders in the Brigade (CPL to LTC)* will report to the Ft. Wainwright Post Theater (Bldg #4108, South Post) NLT 0630. This includes all NCOs and Officers—all leaders, whether the Asst S4, or the Cdr's Driver. All will be seated NLT 0645 and prepared for Leaders' Training. If we max out the seats, then crowd everyone around the outside walls, and have them sit on the floor in the aisles.

**APPENDIX I**—Continued

Uniform is BDU or PT—Bn Cdr's choice, depending on planned activities following leader training.

I expect Bn and Co Cdrs (TO INCLUDE CDRS SOR WHO DON'T ATTEND) to ensure the following happens after my leader training:

- Declare war on all leaders not leading by example, both on and off duty. Counsel them and inform them that continued failure to lead by example will result in relief, negative OER/NCOER; or UCMJ action.

- Develop, and discuss with all soldiers, prior to release from duty 23/24 Dec the unit plan for ZERO DUIs during the holiday period (most units already have a plan—pump new blood into them).

- Ensure EVERY single soldier, or geographical batchelor, in the Brigade is invited over to someone's home, or the unit is having a special barracks function, unit meal in the DFAC, etc. on Christmas Day.

- Ensure all new soldiers (the Brigade has recently had an influx of new soldiers) are integrated into the unit, and NOT being treated as the "FNG" prior to Christmas. If you don't have a good integration plan for the new soldiers, you will have a rash of problems, DUIs, etc. over the holiday period. Be proactive, and ensure this doesn't happen. Junior officers/NCOs normally don't understand this, and don't even know it's happening. I expect Bn Cdrs and CSMs to educate them, and ensure junior NCOs and soldiers aren't abusing new arrivals, and are properly integrating them into the unit.

I am sick of leaders who are leaders by virtue of their rank only. My New Years Resolution is to CRUSH all leaders in this Brigade who don't lead by example, on and off duty. Leaders must focus on developing their REFERENT power, the power given to them by subordinates who respect them because of caring competent leadership, rather than their LEGAL power, which is the power they have by virtue of their rank.

**APPENDIX I**—Continued

To paraphrase a saying, **"The badge of rank on a leader's collar is a symbol of servitude to the soldiers he or she leads."** It is not an opportunity to take advantage of, an opportunity to become self centered, an opportunity to forget what it's like to be a soldier who always gets the shit details, and spends miserable hours in the field, wet from rain, or sleeping on the ground at 30 below.

I'm sick of leaders getting DUIs, abusing their position, being lazy, not achieving Bde PT standards, taking the easy way out regarding safety, and never going the extra mile. I'm sick of encountering leaders who could care less about soldiers, and are SELF CENTERED pukes. I am sick of hearing about leaders who are morally and spiritually bankrupt. I am declaring war on leaders like this, because they don't deserve to be leaders of America's sons and daughters, and they are not doing what the American taxpayer expects them to do.

Here's another quote: **"Destiny is not a matter of chance, but a matter of choice."** Leaders are making decisions and choices, with total disregard to possible short and long range consequences of their choices. I will make it clear in my leaders' training what sort of choices are not going to be tolerated.

The leadership in the Brigade needs to reminded of something very fundamental— "Discipline is the soul of an Army (George Washington)." If leaders don't lead by example, and practice self-discipline, then the very soul of our Army is at risk. No more PSGs getting DUIs, no more NCOs raping female soldiers, no more E7s coming up "hot" for coke, no more stolen equipment, no more "lost" equipment, no more approved personnel actions for leaders with less than 260 APFT, no more leader APFT failures at DA schools,—all of this is BULLSHIT, and I'm going to CRUSH leaders who fail to lead by example, both on and off duty.

See you Tue morning.

COL Brook

## APPENDIX II

*SJA FRA (Curry, LTC)*

From: 1BDE CDR (Brook, COL)
Sent: Friday, January 09, 1998 15:22 PM
To: 1 BDE CSM (Pagan CSM Carlos); 1/501 CDR (Cole, LTC Thomas); 1/501 CSM (Kelso, CSM); 1–17 BN CommandGrp(Okita, LTC); 1st Bde DCO (Withers, LTC G); 2–1 Inf CDR (Torres, LTC); 3rd ASOS (Bowers, LTC Kerry); 4–11 FA CDR (Saul, LTC L); 4–11 FA CSM (Jackson, CSM); 4–123 BN Cdr (Moody, LTC M); 46 SB BN CDR (Parker LTC); 46 SB CSM (Bahr, CSM); CDR FWA (Curry, LTC J); 1–17 BN ACoCdr(Vandenberg,C001; 1–17 BN B CoCdr (Stone CPT); 1–17 BN C CoCdr<Vermeesh,CP001; 1–17 BN HHC CoCdr(WilliamsCPT); 1–501 A Co CDR (Bieger CPT); 1–501 8 Co CDR (Borowski CPT); 1–501 C Co CDR (Vanek CPT); 1–501 HQ CDR (Cummings CPT); 1BDE HHC CDR (Morgan, CPT); 2–1 A CO CDR (Palaza. CPT M); 2–1 B CO CDR (Mangin, CPT P); 2–1 C CO CDR (Robertson,CPT A); 2–1 HHC CDR (Ross. CPT Paul); 21 SIG CDR (McConnell, CPT R); 41 Eng C Co (Robertson, CPT R); 4–11 FA A Btry (Wagner, CPT B); 4–11 FA B Btry (Chapman, CPT K); 4–11 FA C Btry (Armsworth, T); 4–11 FA HHSB (Kilgallon J); 46 SB A Co CDR (Skrabacz, CPT); 46 SB B Co Cdr (Neasbitt,CPT); 46 SB C Co CDR (Brant CPT); 46 SB HHC Cdr (Hamlet, CPT B); 46 Sup D co CDR (Walker CPT); E3–17 CAV CDR (Mondelli, CPT); F/110 MI ABN DET (Chapman 1LT); F110 CDR (Scanion, CPT Robert); LRSD CDR (Broek CPT Hal)
Cc: USARAK CofS (DeWitt, COL); SJA FRA (Curry, LTC); USARAK CG (Simpson, MG Kenneth; 1 BDE Asst. S3 (Kelley, CPT P); 1 BDE AsstS3 Plans (Schroeder); 1 BDE Automation (DeSilva CPT); 1 BDE ChemOfc (McGuire,MAJ J); 1 BDE PMO (Hagan, CPT W); 1 BDE S1 (Agee, MAJ M); 1 BDE S2 Plans(Elliot,CPT); 1 BDE S3 (Hager, MAJ Gregory); 1 Bde SIB S3 Air (Baker,CPT C); 1 BDE XO (Thomas, MAJ Richard); 1/17 BN ExecOff <Davis, MAJ K>; 1/17th BN S3 (Carlson. MAJ R); 1/501 S1 (Magee, 1LT); 1/501 S3 (Johnson.MAJ); 1/501 S4 (Hadley, CPT); 1/501 SIGO (Moss, CPT Mark); 1/501 XO (Wood, MAJ Ward); 1–17 BN Chem Off (Larimer.2LT); 1–17 BN S1 (Vallely CPT); 1–17 BN S2 (Elliott, CPT); 1–17 BN S2 BICC (Karste 1LT); 1–17 BN S3 Air(Kammerzell CPT); 1–17 BN Sig Off (Burnett, CPT); 1–501 A 1SG (Barron, 1SG); 1–501 B Co 1SG (Painter 1SG); 1–501 BMO (CW2 Bridger, Rober); 1–501 Bn Ch (Watters CPT) 001; 1–501 C Co (Dunn. 1SG Dennis); 1–501 S2 (McAden, CPT Jamle); 1–501 Tng (Tonsmeire CPT) 001; 1BDE AWB S1 (Moran 2LT); 1BDE CDR SEC (Paylow SGT); 1BDE CHAP (Neetz MAJ); 1BDE ENG (Neidig CPT); 1BDE FSE TGT OFF(NeiningerCW2); 1BDE FSO (Goldman MAJ); 1BDE HHC 1SG (Bridier 1SG); 1BDE PAO (MEYER 1LT); 1BDE S1 ASSISTANT (Odom CPT); 1BDE S2 OPRS OFCR(PotkovicCPT); 1BDE S3 SGT MAJ (Garner, SGM); 1BDE S3 TNG (Reherman, CPT); 1BDE S4 (Stover CPT); 1BDE S4 FOOD (Pisney, CW2); 1BDE S4 FOOD NCO (Roy, MSG); 1BDE S5 NCO (Head, SSG); 1st Bde BAMO (Harris, SFC); 1st Bde Sig Off (Snyder.CPT); 2–1 BN S1 Off (Harry, 1LT H); 2–1 Inf OPS (Greany, CPT Peter); 2–1 Inf XO (Patterson, MAJ M); 4–11 FA (Carns CPT James); 4–11 FA (Carswell, CPT Bruce); 4–11 FA Chaplain (Brisson CPT); 4–11 FA Radar (Sigler, CW2); 4–11 FA S1 (Patterson, 1LT); 4–11 FA S2 (Waldrep, 1LT); 4–11 FA S–3 (Powell, MAJ T); 4–11 FA XO (Sweeny, MAJ P); 46 SB ASST S3 (Gulley, CPT); 46 SB BMMC OIC (Liberg MAJ); 46 SB BN XO (Gaslin MAJ); 46 SB Mtr Ofcr (Caudill,CPT J); 46 SB S1 (Pilarski. 1LT Carol); 46 SB S2 (Hetherington,2LT R); 46 SB S3 (Gltter, MAJ K); 46 SB SupOperOfcr (Doyle.CPT); JAG FWALC OfcChg(Ackerman LTC)
Subject: Leadership & UCMJ
Importance: High

Cdrs / Staff:

Before Christmas, when I conducted Leader Training for the Brigade's NCOs and officers, I sent an email laying out my utter disappointment for the failure of some leaders in the Brigade to meet and exceed standards of personal and professional behavior. If you are reading this email now, you were an addressee of my 21 December 1997 email.

I want to make perfectly clear what my earlier email meant and, importantly, what it didn't mean.

With the privilege of rank comes the responsibility of leadership. Part of that responsibility includes accountability for lapses in leadership or deficiencies in conduct. Accountability may take on any number of corrective actions designed to punish and correct including counseling, reprimand, relief, adverse OER/NCOER, *nonjudicial* punishment, or court-martial.

When I wrote that I expected Bn and Co Cdrs to "Declare war on all leaders not leading by example, both on and off duty," I expect just that, because it is self-evident that NCOs and officers who violate the trust of their office and fail to lead by example have a cumulative negative effect on good order and discipline in this Brigade. The plain truth is that the Army expects more of its NCOs and officers than of its Privates. The Brigade has experienced an indiscipline problem and I expect Commanders at all levels to address the problems appropriately.

OK, what's appropriate? Appropriate action is what each individual commander, be it Bn or Co, deems so in the exercise of independent discretion. As I mentioned in my earlier email, I expect Bn and Co Cdrs to counsel leaders that have engaged in acts of personal or professional misconduct that "continued failure to lead by example will result in relief, negative OER/NCOER, or UCMJ action." By this, I am directing no specific course of action for any case or incident. Every leader in the Brigade needs to be on notice of what the full range of adverse actions are for continued acts of misconduct and I expect Bn and Co Cdrs to put them on notice.

No Bn or Co Cdr will take adverse action or recommend such against an NCO or officer

who has failed to lead by example solely to please me. The Congress of this great Nation vested commanders with disciplinary powers under the UCMJ commensurate with level of command. Any officer incapable of exercising those powers as intended—through independent discretion on the individual merits of each case—is unworthy of command. I expect and demand no less. If anyone has read more into my earlier email than this—YOU ARE MISTAKEN.

Now, am I concerned about NCOs and officers who drive drunk? YES. Who engage in sexual misconduct with subordinate soldiers? YES. Who use illegal drugs? YES. Who allow military equipment to be lost or stolen? YES! Any Brigade Commander unconcerned about these things when brought to his attention needs to find another line of work. What I expect is for leaders to understand that they will be held accountable for their conduct. How that is done at levels subordinate to me, is up to all Bn and Co Cdrs.

Let me make something else perfectly clear. Nothing in what I have said in this or the earlier email, or what I said at the Leader Training, has anything to do with what any soldier does as a member of a court-martial panel or as a witness before a court-martial. The sworn duty of any court-martial panel member is to follow the instructions of the military judge, apply law to admissible facts, and decide a sentence based solely on the evidence presented in court. Nothing said outside a court-martial by anybody, TO INCLUDE ME, may have any bearing on the outcome of any given case or sentence. Just as important, our system of justice—the best system in the world—demands that soldiers called as witnesses (be it by the Government or by the Defense) testify truthfully. Truthful testimony includes testifying on behalf of soldiers (including NCOs and officers) who may have committed or alleged to have committed misconduct. For example, if a soldier has performed well in his MOS, but is accused of some offense. I expect all Brigade soldiers asked to testify during a court-martial with favorable information about the soldier to do so willingly.

APPENDIX II—Continued

I have taken this time to clarify and refine my earlier email because it is IMPORTANT. Any leader who is in anyway confused about my intent is under an obligation to come see me. The bottom line is that our soldiers deserve the best leaders our Country can provide. These leaders must be caring, competent, confident, and courageous. They must also hold dear those enduring values upon which our Army rests: duty, honor, courage, loyalty, integrity, respect, and self-less service. If, as leaders, we all keep this close to heart our soldiers and this Country will be well-served, and the lapses of personal and professional conduct will not happen.

COL Brook