UNITED STATES, Appellee,

v.

Roger E. THOMAS, Specialist Four,
U.S. Army, Appellant.

UNITED STATES, Appellee,

v.

Franklin K. COOK, Jr., Staff Sergeant,
U.S. Army, Appellant.

UNITED STATES, Appellee,

v.

Donald J. GIARRATANO, Specialist
Five, U.S. Army, Appellant.

UNITED STATES, Appellee,

v.

Kurt R. GONZALES, Private, U.S.
Army, Appellant.

Nos. 48,011, 51,496, 52,896 and 53,423.
CM 443527, CM 444195, SPCM 20588
and CM 444804.

U.S. Court of Military Appeals.

Sept. 22, 1986.

For Appellant (Cook): *Lieutenant Colonel William P. Heaston* (argued); *Colonel William G. Eckhardt, Colonel Brooks B. La Grua, Major Edwin D. Selby, Captain Lorraine Lee.*

For Appellee: *Captain Samuel J. Rob* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Thomas M. Curtis, Lieutenant Colonel Gary F. Roberson.*

For Appellant (Giarratano): *Captain Craig E. Teller* (argued); *Colonel Brooks B. La Grua, Lieutenant Colonel William P. Heaston, Lieutenant Colonel Paul J. Luedtke, Major Eric T. Franzen, Captain Lorraine Lee.*

For Appellee: *Captain Samuel J. Rob* (argued); *Colonel James Kucera, Lieutenant Colonel Gary F. Roberson, Lieutenant Colonel Adrian J. Gravelle.*

For Appellant (Gonzales): *Captain Lorraine Lee* (argued); *Lieutenant Colonel Paul J. Luedtke* and *Major Eric T. Franzen.*

For Appellee: *Captain Erik M. Stumpfel* (argued); *Colonel James Kucera, Lieutenant Colonel Gary F. Roberson, Lieutenant Colonel Adrian J. Gravelle.*

For Appellant (Thomas): *Captain H. Alan Pell* (argued); *Colonel William G. Eckhardt, Lieutenant Colonel William P. Heaston, Lieutenant Colonel Paul J. Luedtke, Major Edwin D. Selby, Captain Craig E. Teller, Captain Audrey H. Liebross.*

For Appellee: *Captain Erik M. Stumpfel* (argued); *Colonel James Kucera, Lieutenant Colonel Gary F. Roberson, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Thomas M. Curtis, Captain Samuel J. Rob.*

*Opinion of the Court*

EVERETT, Chief Judge:

These four cases, all argued on the same day, are among many received by this Court and by the United States Army Court of Military Review which question the fairness of the court-martial proceedings because of certain acts and comments of Major General Thurman E. Anderson, the Commanding General of Third Armored Division, and members of his staff.

During one or more briefings conducted among officers and noncommissioned officers within his command, General Anderson addressed the subject of testifying at an accused's court-martial. He stated that he found it paradoxical for a unit commander, who had recommended that an accused be tried by a court-martial authorized to adjudge a punitive discharge, to later appear as a defense character witness at

the sentencing stage of the trial, testify as to the accused's good character, and recommend that the convicted soldier be retained in the service. Some of General Anderson's remarks were elaborated upon and possibly distorted by his subordinates. Be that as it may, his comments were later interpreted, or misinterpreted, to reflect an intent that a commander, first sergeant, or other person from an accused's unit, should not give favorable presentencing testimony on behalf of an accused. This interpretation may have also extended to findings.[1]

Based on the record of trial in appellant Giarratano's case and on the special findings by the military judge in that case[2], the Court of Military Review concluded that command influence was present at the Third Armored Division. *United States v. Treakle*, 18 M.J. 646 (A.C.M.R.1984). Depending on the facts of each case, the Court of Military Review fashioned several different remedies. These included sentence rehearings, if the record failed to show affirmatively that, in sentencing, the court members had not in fact been influenced by General Anderson's comments, *United States v. Treakle, supra* at 658–59; rehearings or reassessment of the sentence, if the record failed to show why the defense had not produced any character witnesses or if one or more witnesses who testified appeared to have been negatively influenced by General Anderson's remarks,

*United States v. Schroeder,* 18 M.J. 792 (A.C.M.R.1984); *United States v. Hill,* 18 M.J. 757 (A.C.M.R.1984); and limited hearings to determine whether the accused had been deprived of character witnesses at the sentencing stage of the trial, *United States v. Abelon,* 19 M.J. 767 (A.C.M.R.1984); *United States v. Thompson,* 19 M.J. 690 (A.C.M.R.1984).

When additional information came to the attention of the Court of Military Review in the form of affidavits prepared by two officers from the Third Armored Division, that court first began to take remedial action at both the findings and post-trial review stages of the proceedings.[3] Thus, in *United States v. Mitchell,* 19 M.J. 905 (A.C.M.R.1985), the Court ordered a limited hearing on whether the court members had heard General Anderson's remarks and were influenced by them. If so, the findings and sentence were to be set aside and a rehearing ordered. In *United States v. Glidewell,* 19 M.J. 797 (A.C.M.R.1985), the Court of Military Review ordered a new review and action; and in *United States v. Scott,* 20 M.J. 1012 (A.C.M.R.1985); *United States v. Abelon* and *United States v. Thompson,* both *supra,* limited hearings were ordered to determine, among other issues, whether General Anderson was disqualified from reviewing and taking action on the case.

---

1. A detailed summary of the facts may be found in Part II of *United States v. Treakle,* 18 M.J. 646, 649–52 (through the first paragraph in the right column on page 652) (A.C.M.R.1984).

2. In *United States v. Giarratano,* the military judge found that the oral comments of General Anderson and the oral and written comments of his subordinates would logically cause members of the Third Armored Division to conclude that the commander who refers charges for trial to a general court-martial or special court-martial authorized to adjudge a bad-conduct discharge believes that the accused is guilty and should be punitively discharged and that any extenuation and mitigation testimony favorable to the accused should be ignored as meaningless or incredible. The military judge determined in *Giarratano* that the comments—taken together and in context—would reasonably cause an accused to be convicted more readily or subjected to a heavier sentence.

3. These officers were Lieutenant Colonel Mueller and Major Buchanan. Briefly summarized, Lieutenant Colonel Mueller's affidavit stated that he had been informed by Lieutenant Colonel Bozeman, the staff judge advocate of Third Armored Division, that General Anderson was displeased because Colonel Mueller had testified as a defense witness at the trials of two accused. Bozeman allegedly told Mueller that if a commander recommends trial by a court-martial authorized to adjudge a punitive discharge, he must believe that the accused is guilty and should be eliminated from the service. Major Buchanan's affidavit corroborates Mueller's statement. He alleges that Bozeman stated that neither he nor the commander believed that it was proper for Mueller to testify as a defense witness.

With this background, we now turn to the central issue of these cases:

Were the remedial actions taken by the Court of Military Review appropriate and adequate, under the circumstances of each case, to eliminate the prejudicial impact of unlawful command influence found to have been exercised within the Third Armored Division, or did General Anderson's comments have such a deleterious effect on the judicial process that even more drastic action, such as automatic reversal of the findings and sentence, is required?

In answering this question, we will begin by considering the general's actions at the referral stage of the trial, proceed through the findings and sentence, and end with the final review and action by the convening authority.

## I

### Preliminary Observations

Command influence is the mortal enemy of military justice. Therefore, in the Uniform Code of Military Justice, Congress specifically prohibited such activity. Art. 37, 10 U.S.C. § 837; see also Art. 98, UCMJ, 10 U.S.C. § 898. Subsequently, the Military Justice Act of 1968 expanded the command-influence prohibitions of Article 37. Pub.L.No. 90–632, § 2(13), 82 Stat. 1338. Indeed, a prime motivation for establishing a civilian Court of Military Appeals was to erect a further bulwark against impermissible command influence. See Hearings on H.R. 2498 Before a Subcomm. of the House Committee on Armed Service, 81st Cong., 1st Sess. 608 (1949).

The exercise of command influence tends to deprive servicemembers of their constitutional rights. If directed against prospective defense witnesses, it transgresses the accused's right to have access to favorable evidence. U.S. Const. amend. VI; cf. Art. 46, U.C.M.J., 10 U.S.C. § 846. If directed against defense counsel, it affects adversely an accused's right to effective assistance of counsel. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); U.S. Const. amend. VI; cf. Art. 27,

UCMJ, 10 U.S.C. § 827, and Art. 37. If the target is a court member or the military judge, then the tendency is to deprive the accused of his right to a forum where impartiality is not impaired because the court personnel have a personal interest in not incurring reprisals by the convening authority due to a failure to reach his intended result. Cf. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); United States v. Accordino, 20 M.J. 102 (C.M.A.1985).

Under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), a constitutional violation has been considered prejudicial unless the reviewing court concludes beyond a reasonable doubt that the trial result was not affected by the error. Cf. United States v. Remai, 19 M.J. 229 (C.M.A.1985). We observe that in some recent cases the Supreme Court seems to have retreated slightly from this standard. Cf. United States v. Bagley, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, in Bagley, the Supreme Court continued to apply the beyond-reasonable-doubt test where the prosecution knowingly used perjured testimony. The justification for employing this strict standard is "that the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves 'a corruption of the truth-seeking function of the trial process.'" 105 S.Ct. at 3382.

This rationale applies equally to command influence. A commander who causes charges to be preferred or referred for trial is closely enough related to the prosecution of the case that the use of command influence by him and his staff equates to "prosecutorial misconduct." Indeed, recognizing the realities of the structured military society, improper conduct by a commander may be even more injurious than such activity by a prosecutor. Likewise, as was perfectly clear to Congress when it enacted the Uniform Code of Military Justice and the Military Justice Act of 1968—and as the judges of this Court have al-

ways understood—command influence "involves 'a corruption of the truth-seeking function of the trial process.' "

■ Consequently, in cases where unlawful command influence has been exercised, no reviewing court may properly affirm findings and sentence unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence.

## II

### Referral for Trial

■ Articles 22–24, UCMJ, 10 U.S.C. §§ 822–824, respectively, prescribe who may convene various types of courts-martial. If a court-martial is convened by someone who is not in one of the categories set forth in those articles, then its action can be set aside for lack of jurisdiction. Articles 22(b) and 23(b) also direct that an officer shall not convene a general or special court-martial, if he "is an accuser." According to Article 1(9), UCMJ, 10 U.S.C. § 801(9), an "accuser" is "a person who signs and swears to charges ... and any other person who has an interest other than an official interest in the prosecution of the accused."

Despite General Anderson's misguided zeal, his initial interest in the various prosecutions was official, rather than personal. Unlike the convening authority in *United States v. Gordon*, 1 U.S.C.M.A. 255, 2 C.M.R. 161 (1952), whose house had been broken into by the accused, General Anderson had not suffered an injury to his person or property. Unlike the convening authority in *United States v. Crossley*, 10 M.J. 376 (C.M.A.1981), and in *United States v. Shepherd*, 9 U.S.C.M.A. 90, 95–100, 25 C.M.R. 352, 357–62 (1958), his ego was not directly assailed by the accused's actions. Unlike the convening authority in *United States v. Corcoran*, 17 M.J. 137 (C.M.A.1984), and in *United States v. Marsh*, 3 U.S.C.M.A. 48, 11 C.M.R. 48

(1953),[4] his authority was not willfully flouted.

■ At a later time, after the wholesale exercise of command influence had come to light, the situation changed somewhat. At that point, General Anderson and his staff judge advocate, Lieutenant Colonel John R. Bozeman, were being attacked repeatedly, and the general probably had become quite defensive about his prior remarks. Perhaps, he then possessed a disqualifying personal interest in the outcome of cases to be referred. However, even then any defect in referral would not have been jurisdictional. *Cf. United States v. Ridley*, 22 M.J. 43 (C.M.A.1986); *United States v. Blaylock*, 15 M.J. 190 (C.M.A.1983). Thus, the findings and sentence would not be void but would only be subject to being set aside upon appellate review.

■ Another claim that has been presented with respect to referrals is that General Anderson's remarks may have led unit commanders to recommend a higher echelon of court-martial than otherwise might have been utilized. However, as we understand the tenor of his comments, they were directed chiefly towards conduct of prospective witnesses after charges had been preferred, and they tended to cut off testimony in an accused's behalf only after a recommendation for his court-martial had been made. Thus, during processing of charges before referral, General Anderson's comments would not have adversely affected an accused. Conceivably, those remarks might even have benefited an accused because if his unit commander entertained a favorable opinion of him, that commander might have utilized nonjudicial punishment or administrative action, instead of seeking trial by court-martial where the results might prove to be too harsh.

## III

### Findings Based on Pleas of Guilty

■ In many of the cases referred by General Anderson, guilty pleas were en-

---

**4.** *Marsh* was itself an extreme case and has been greatly restricted by *United States v. Teal*, 4 U.S.C.M.A. 39, 15 C.M.R. 39 (1954); and *United*

*States v. Keith*, 3 U.S.C.M.A. 579, 13 C.M.R. 135 (1953).

tered—usually pursuant to pretrial agreements. Now it is contended that these accused should be allowed to withdraw these pleas and that the findings based thereon should be vacated. One rationale for this argument is that the pleas were involuntary because evidence available to such an accused was curtailed by General Anderson's actions, so guilty pleas were entered merely by reason of the hopeless predicament in which the accused had been placed. Another argument is that the actions of General Anderson were so pernicious that, *per se*, they tainted every proceeding with which he had any contact. *Cf. United States v. Treakle, supra* at 663 (Yawn, J., concurring in part and dissenting in part).

We are not persuaded by these arguments. In the first place, we are unable to find in the records before us any accused who entered a guilty plea because of the unavailability of witnesses who, in the absence of General Anderson's interference, might have testified at trial. Certainly, no such claim has been brought to our attention. *Cf. Hill v. Lockhart,* —— U.S. ——, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

In this connection, we note that in trials by court-martial there is special concern that an accused's pleas of guilty be provident and that a plea of guilty not be accepted unless an accused truly believes that he is guilty. Article 45 of the Uniform Code of Military Justice, 10 U.S.C. § 845, requires that a guilty plea be vacated if the accused offers evidence inconsistent therewith. Moreover, the providence inquiry prescribed by this Court requires that an accused who pleads guilty be questioned by the judge about the relevant facts in order to establish a factual basis for the plea. *See United States v. King,* 3 M.J. 458 (C.M.A.1977); *United States v. Green,* 1 M.J. 453 (C.M.A.1976). From his own lips, such an accused must affirm that he knows he is guilty of the elements of the offense or that—if he lacks such knowledge for some reason, such as amnesia—he is satisfied as to the existence of the facts establishing his guilt. *See United States v. Butler,* 20 U.S.C.M.A. 247, 43 C.M.R. 87

(1971). Moreover, as an added guarantee of the accuracy of the guilty plea, the President has prescribed in the Manual for Courts-Martial (1984) that an accused shall be under oath when he testifies at a providence hearing. R.C.M. 910(e), Manual for Courts-Martial, United States, 1984.

Thus, the situation in courts-martial is unlike that which prevails in many civilian courts, where a plea of guilty may be accepted even though a defendant maintains his innocence. *Cf. North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Because of these limitations, military justice usually is not characterized by the extensive prosecutorial arm-twisting to obtain guilty pleas that exists in some civilian courts. *Cf. Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

In view of the safeguards surrounding the entry of guilty pleas by accused servicemembers, we perceive no unfairness in letting stand the guilty pleas entered in cases from the Third Armored Division. The possibility that, if General Anderson had not interfered, an accused who entered pleas of guilty might have pleaded not-guilty, introduced evidence, and obtained an acquittal is so remote that it does not disturb us—especially where no specific claim to this effect has been made. In these cases, we are persuaded beyond a reasonable doubt that the findings based on these provident guilty pleas were not affected by command influence.

Admittedly, we must be concerned not only with factual accuracy of a trial result but also with the procedures employed in obtaining it. *Cf. Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). For instance, a coerced waiver of the privilege against self-incrimination may require relief, even though the incriminating evidence which is obtained thereby leads to an accurate finding of guilt. However, any indirect pressure to plead guilty generated by General Anderson was of far less magnitude than that which has been regularly tolerated by the Supreme Court. *Cf. Bor-*

*denkircher v. Hayes, supra.* Moreover, there is no indication that any of General Anderson's command-influence activities were intended to induce guilty pleas. Accordingly, we conclude that any guilty pleas entered pursuant to the providence-inquiry procedures previously prescribed by this Court should not be withdrawn, and the findings of guilty entered pursuant to such pleas can be upheld.

### IV

*Findings Based on Pleas of Not Guilty*

In determining whether an accused's trial in a contested case before court members was adversely affected by command influence, we first consider the impact that such activities and communications may have had on the court members. In this regard, we place the burden upon both defense and trial counsel, as well as the military judge, to fully question the court members during voir dire and to determine thereby whether any of the members had knowledge of the commander's comments and, if so, whether the comments had an adverse impact on the member's ability to render an impartial judgment. When required, witnesses may be called to testify on this issue. *United States v. Karlson*, 16 M.J. 469 (C.M.A. 1983). However, we are not prepared to disqualify members of a court-martial panel simply because they were assigned or were in close proximity to the command where the comments were made. To do so would ignore the members' oath to adhere to the military judge's instructions and to determine the facts in accordance therewith. *Cf. United States v. Garwood*, 20 M.J. 148 (C.M.A.1985).

In cases tried by military judge alone, we have no reason to believe that the command influence would have had any impact on the judges, who were completely independent of General Anderson and of other commanders in the field. Moreover, absent some specific claim to the contrary, we shall not assume that an accused chose trial by judge alone because of concerns about the impartiality of the court members.

In contested cases tried by members or by judge alone, a second question is whether the commander's comments so impeded the accused's access to defense witnesses that he was deprived of his sixth-amendment right to have witnesses called on his behalf. As already noted, the standard we shall use in testing for prejudice in this regard is that of *Chapman v. California, supra. Cf. United States v. Remai, supra.*

In view of this high standard, if an accused properly raises the issue that his ability to secure favorable evidence has been impaired, the Government obviously bears a heavy burden in establishing that defense access to witnesses (character or otherwise) was not impeded by command influence to the extent that it affected the results of trial. Indeed, appellate defense counsel might well argue that the Government can never overcome this heavy burden because there will always be a possibility that a witness might have been available who could have tipped the scales in the defense's behalf.

In this connection, we draw a distinction between two classes of witnesses: (a) character witnesses, and (b) witnesses who will testify on matters other than an accused's character. As to the former, there was the greater likelihood that testimony would be inhibited by General Anderson's remarks. It is questionable whether his remarks could have been construed to apply to the latter class of witnesses.

To satisfy its burden of demonstrating that an accused was not deprived of favorable character witnesses, the Government might elect to proceed in one of several ways. The first would be to show that appellant had offered extensive favorable character evidence at trial, so that it could be inferred that General Anderson's remarks had not inhibited the availability of character witnesses. A second way would be to demonstrate from the accused's military records and otherwise

that there simply was no evidence of good character available or that readily available rebuttal evidence of bad character would have been so devastating that, as a tactical matter, the accused could not have afforded the risk of putting his character in evidence. A third way for the Government to meet its burden might be to demonstrate that the prosecution evidence at trial was so overwhelming that there was no way in which the character evidence could have had an effect. This latter alternative should be used very sparingly, however: First, we recognize that character evidence can be very effective in creating reasonable doubt at trial; and, second, we do not wish to create even an appearance of condoning command influence on findings.

██ For witnesses other than character witnesses, the prosecution can satisfy its burden by demonstrating that everyone who had relevant information testified at trial and that none of these witnesses felt under any pressure to testify in a certain way. Another way would be to show that, although some persons with relevant information did not testify, their testimony would have been unfavorable to the accused.

## V

### Sentencing

██ In gauging the effect of command influence on an accused's sentence, the same approach should be used as for findings in contested cases. If the issue is properly raised, the burden is on the Government to establish beyond a reasonable doubt that favorable evidence in extenuation and mitigation was not curtailed by General Anderson's command activities. To satisfy this burden, the Government may demonstrate by an accused's military records or otherwise that no favorable evidence relevant to an accused's service in the Third Armored Division was available, as evidenced by his military records and otherwise, or that the defense made an informed decision not to present such evidence because it would have opened the door to damaging rebuttal evidence readily available to the prosecutor. If the record fails to show that the Government has met its burden, a rehearing on sentence or meaningful reassessment of the sentence, if possible, would be the appropriate remedy.

We note that there is no indication that, in appointing court members, General Anderson sought to name persons who were predisposed to adjudge heavy sentences. *Cf. United States v. McClain*, 22 M.J. 124 (C.M.A.1986). Of course, if he had followed this policy, resentencing would be in order because of the violation of Article 37.

## VI

### Review and Action

██ The Court of Military Review has directed new post-trial reviews in cases where the initial review was performed by General Anderson. Avoidance of any appearance of evil provides ample justification for requiring this procedure. Moreover, in many of the cases he reviewed, General Anderson was confronted with claims that his command influence had prejudiced the accused at trial and necessitated major remedial action. He could hardly be expected to review impartially contentions that his own acts had transgressed Article 37 and had violated the rights of the accused.

## VII

We shall now apply these principles to the four cases presently under consideration.

*United States v. Thomas (Docket No. 48011/AR)*:

██ Specialist Four Thomas was originally tried by a military judge sitting alone as a general court-martial on October 25, 1982. Pursuant to his negotiated pleas, he was found guilty of aggravated assault, violation of a lawful general regulation by possessing a switchblade knife, and committing an assault and battery with his fists, in violation of Articles 128 and 92, UCMJ, 10 U.S.C. §§ 928 and 892, respec-

tively. His sentence to a dishonorable discharge, confinement for 12 months, total forfeitures, and reduction to the grade of E–1 was approved by General Anderson on December 14, 1982.

As the issue of command influence in this case had first been raised in this Court, the record was remanded to the Court of Military Review in January 1984. That Court ordered a rehearing on sentence because of the few witnesses who had testified on behalf of the appellant during the sentence proceedings. At the sentence rehearing conducted by direction of the Commander, 1st Infantry Division (Mech), the defense introduced stipulations of expected testimony from Thomas' platoon leader and squad leader and favorable evidence regarding his performance while he was confined and while he was employed when on excess leave. He was sentenced to a bad-conduct discharge, confinement for 10 months, total forfeitures, and reduction to the lowest enlisted grade. The new general court-martial convening authority reduced the period of confinement to 8 months but otherwise approved the sentence as adjudged. On August 2, 1985, the Court of Military Review affirmed the sentence adjudged at the rehearing.

The remedy adopted by the Court of Military Review eliminated any possibility of prejudice. Our examination of the providence inquiry convinces us that Thomas' pleas of guilty were not affected by the command-influence problem and were based upon his belief in his own guilt. The rehearing on sentence and the action by a new reviewing authority remedied any problems which may have existed at these stages of the proceedings. Accordingly, we conclude that the decision of the Court of Military Review is correct.

*United States v. Cook (Docket No. 51496/AR)*:

■ Sergeant Cook was tried before a military judge alone on February 10, 1983. Pursuant to his negotiated pleas, he was found guilty of unauthorized absence, resisting apprehension, escape from custody, possession of hashish, and two bad-check offenses, in violation of Articles 86, 95, 134, and 123a, UCMJ, 10 U.S.C. §§ 886, 895, 934, and 923a, respectively. He was sentenced to a bad-conduct discharge and reduction to the grade of E–1. The findings and sentence were approved by General Anderson on April 23, 1984. On October 31, 1984, the Court of Military Review set aside the bad-conduct discharge because "no one from appellant's ... command testified during sentencing" and "[t]he record provide[d] no explanation" as to why such witnesses did not appear. Unpublished opinion at 3.

The substantial reduction of the sentence by the Court of Military Review eliminated any possibility that Sergeant Cook was prejudiced by the absence of character witnesses during the sentencing stage of his trial. Likewise, appellant could not have been prejudiced by the failure of the Court of Military Review to order a new review and action by another convening authority. It is highly unlikely that any new convening authority would equal the sentence relief given by the Court of Military Review. Accordingly, we conclude that the decision of the Court of Military Review is correct.

*United States v. Giarratano (Docket No. 52896/AR)*:

■ After hearing the voluminous evidence presented on the command-influence issue, the military judge found that no person in Giarratano's chain of command had attended any of General Anderson's meetings and none had discussed the charges against Giarratano with General Anderson. He nevertheless found that the following remedial actions were required:

(1) If the accused elected trial by members, he would "sustain any [defense] challenge for cause against a panel member who was a member of a Third Armored Division unit prior to 4 March 1983" (date General Anderson first attempted to clarify or retract some of his earlier statements).

(2) Although "no member of" Giarratano's "chain of command testified that they were unlawfully directed or influ-

enced not to testify" on his behalf and none expressed "any fear of" reprisal if they did so, the military judge ruled, as a matter of caution, that no character evidence would be received which was "unfavorable to the accused."

(3) As General Anderson's "credibility [was] called into question," the military judge found that the general was disqualified from taking action on the case.

Thereafter, Giarratano elected to be tried by judge alone. He made no claim that his choice was based on any fear that a court-martial composed of members would be unable to render a fair verdict. Contrary to his pleas, he was found guilty of distributing hashish, in violation of Article 134, UCMJ, 10 U.S.C. § 934. The evidence to prove his guilt was overwhelming. The Government showed that Giarratano sold three pieces of hashish to two undercover agents. The defense presented no evidence on the merits. Except for Giarratano's own sworn statement during the presentencing stage of the trial, no other witnesses were called by the defense. Trial defense counsel had informed the military judge at an earlier stage of the trial, however, that he was "not aware of any chilling effect upon potential witnesses in the case." Giarratano's sentence to a bad-conduct discharge, confinement for 3 months, forfeiture of $100.00 pay per month for 3 months, and reduction to the grade of E–1 was approved by the Commander, 21st Support Command, on April 12, 1984. The Court of Military Review affirmed. 20 M.J. 553 (A.C.M.R.1985).

We perceive no basis for concluding that the convening authority was disqualified to refer the case for trial. The extensive findings of fact in *Giarratano* and the remedial actions taken by the military judge eliminated any possibility of prejudice at either the findings, sentencing, or review stages of the proceedings. Accordingly, we conclude that the decision of the Court of Military Review is correct.

*United States v. Gonzales (Docket No. 53423/AR)*:

 The remedy employed by the Court of Military Review in this case was the same as that in *United States v. Thomas*. Gonzales was tried on July 21, 1983, by a military judge sitting alone as a general court-martial. Pursuant to his pleas, he was convicted of two specifications of distribution of marijuana; using a false pass; as well as possession of hashish and marijuana with intent to distribute, in violation of Article 134, UCMJ, 10 U.S.C. § 934. He was sentenced to a dishonorable discharge, confinement for 16 months, total forfeitures, and reduction to the grade of E–1. Adhering to the terms of a pretrial agreement, General Anderson approved the sentence but suspended confinement in excess of 14 months for a period of 6 months.

On November 5, 1984, the Court of Military Review permitted a rehearing on sentence if ordered by a different convening authority because no witnesses had testified for appellant and the record was silent as to why such witnesses were absent. At the sentence rehearing conducted in January 1985, the defense presented, by way of stipulation, favorable testimony from Gonzales' former platoon sergeant. The defense also assured the military judge that other potential witnesses had been contacted but that the defense had elected not to produce them. Gonzales' sentence at the rehearing to a dishonorable discharge, confinement for 10 months, total forfeitures, and reduction to the lowest enlisted grade was approved by the Commander, Fort Leavenworth, on February 11, 1985. This sentence was affirmed by the Court of Military Review on June 25, 1985.

At the time of referral, General Anderson was not disqualified to act as a convening authority. The sentence rehearing and action by a different convening authority cured any prejudicial error that may have been caused by General Anderson's remarks. Accordingly, we conclude that the decision of the Court of Military Review is correct.

## VIII

### *Epilogue*

In all four of these cases, we have upheld the decision of the Court of Military

Review. Lest our action be construed as a tacit acceptance of illegal command influence in military justice, we emphasize that the decisions of the court below were preceded by extensive remedial action at that level. Indeed, we commend that court for recognizing the inherent dangers caused by illegal command influence and for deciding each case in a manner consistent with legislative intent and prior case law.

This Court understands the desire of military commanders to assure that the members of their commands adhere to high standards of discipline. Certainly, we do not wish to inhibit lawful zeal in achieving this end. However, Congress, in its wisdom and pursuant to powers conferred upon it by the Constitution, has placed limits on the means that can be employed by commanders in seeking to maintain discipline. Moreover, we are convinced that most commanders understand full well the reasons why in our democratic society Congress considered these limitations to be appropriate.

One of the most sacred duties of a commander is to administer fairly the military justice system for those under his command. In these cases, the commander, for whatever reason, failed to perform that duty adequately. Likewise, it is also apparent either that his legal advisor failed to perceive that a problem was developing from General Anderson's stated policies or that he was unable or unwilling to assure that the commander stayed within the bounds prescribed by the Uniform Code of Military Justice. The delay and expense occasioned by General Anderson's intemperate remarks and by his staff's implementation of their understanding of those remarks are incalculable. Several hundred soldiers have been affected directly or indirectly—if only because of the extra time required for completing appellate review of their cases. In addition, the military personnel resources—as well as those of this Court—required to identify and to surgically remove any possible impact of General Anderson's overreaching have been im-

mense. Finally, and of vital importance, the adverse public perception of military justice which results from cases like these undercuts the continuing efforts of many—both in and out of the Armed Services—to demonstrate that military justice is fair and compares favorably in that respect to its civilian counterparts.

A primary responsibility of this Court in its role as civilian overseer for the military justice system is to ensure that commanders perform their military-justice responsibilities properly and that they are provided adequate guidance by their legal advisors in performing those responsibilities. Merely remedying the error in the cases before us is not enough. Instead, we wish to make it clear that incidents of illegal command influence simply must not recur in other commands in the future.

Recognizing that military commanders and judge advocates usually exert themselves in every way to comply with both the spirit and the letter of the law, we are confident that events like those involved here will not be repeated. However, if we have erred in this expectation, this Court—and undoubtedly other tribunals—will find it necessary to consider much more drastic remedies.

The decisions of the United States Army Court of Military Review in Number 48,011 (Thomas); 51,496 (Cook); 52,896 (Giarratano); and 53,423 (Gonzales) are affirmed.

Judge SULLIVAN did not participate.[5]

COX, Judge (concurring):

I concur with Chief Judge EVERETT and join him in recognizing the hard work put into these cases by the Court of Military Review and appellate counsel, both for the Government and the defense. I am satisfied that as a result of the careful scrutiny given each record of trial, any possible prejudice that a soldier may have suffered has been ferreted out and corrected. If not, the doors of this Court remain open to hear particularized claims of prejudice.

---

5. Judge Sullivan did not participate in the decision of any other case involving the issues decided herein.