*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

### UNITED STATES
Appellee

**v.**

### Eric R. PROCTOR, Technical Sergeant
United States Air Force, Appellant

**No. 20-0340**
Crim. App. No. S32554

Argued February 10, 2021—Decided June 2, 2021,

Military Judge: Christina M. Jimenez

For Appellant: *Captain Ryan S. Crnkovich* (argued); *Mark C. Bruegger,* Esq. (on brief); *Major David A. Schiavone.*

For Appellee: *Major Jessica L. Delaney* (argued); *Colonel Shaun S. Speranza*, *Lieutenant Colonel Matthew J. Neil*, and *Mary Ellen Payne,* Esq. (on brief).

Judge HARDY delivered the opinion of the Court, in which Judge SPARKS and Judge MAGGS joined. Chief Judge STUCKY filed a dissenting opinion, in which Judge OHLSON joined.

————————

Judge HARDY delivered the opinion of the Court.

Over a year before Appellant's court-martial, but after he was known to have committed the misconduct for which he was later convicted, Appellant's commanding officer, Lieutenant Colonel (Lt Col) MS, conducted a regularly scheduled commander's call with the entire squadron. Lt Col MS discussed a variety of topics during the call, including military awards, civilian achievements, sexual assault, and recent noncommissioned officer (NCO) misbehavior and poor decision-making. Although Lt Col MS did not mention any NCO by name or reference any specific incidents of NCO misconduct, his remarks about NCOs were motivated, in part, by his knowledge of Appellant's actions.

As part of the discussion about NCO misconduct, Lt Col MS encouraged the squadron to support their fellow airmen, no matter what process or difficulty the airman may be going

through, but cautioned the squadron to not "enable" bad behavior. To illustrate this point, Lt Col MS related an anecdote about a decision he made earlier in his career when he was an NCO to not write a character letter on behalf of a junior airman who was facing nonjudicial punishment for missing curfew. Lt Col MS explained that he felt he could not write a letter in support of the airman because the airman's conduct diminished good order and discipline in the unit.

Prior to his court-martial, Appellant filed a motion seeking the dismissal of his case due to "actual and perceived unlawful command influence." Appellant argued that Lt Col MS's statements during the commander's call discouraged Appellant's coworkers from providing character letters or testifying on Appellant's behalf. Both the trial court and the United States Air Force Court of Criminal Appeals (AFCCA) rejected Appellant's claim, and we do as well. Although Appellant provided some evidence of unlawful command influence, we conclude that an objective, disinterested observer would not harbor any significant doubts about the ultimate fairness of Appellant's court-martial proceeding. Accordingly, we hold that there was no appearance of unlawful command influence in this case, and we affirm the decision of the AFCCA.

## I. Background

At the time of his court-martial, Appellant was a technical sergeant (E-6) assigned to the security forces squadron at Schriever Air Force Base, Colorado. The specifics of the misconduct that led to Appellant's court-martial are not particularly relevant to the legal issue before us. It is sufficient to note that Appellant's convictions were the result of misconduct with other airmen in his squadron, including interactions he had with his girlfriend, Staff Sergeant (SSgt) CM.

What is important, however, was the timing and details of other events preceding Appellant's court-martial. Appellant's commanding officer, Lt Col MS, originally preferred charges against Appellant on June 7, 2017. These initial charges were withdrawn without prejudice on August 1, 2017. About a week later, on August 7, 2017, Lt Col MS held his biannual

commander's call, which had been planned months in advance. At the time of the call, Lt Col MS knew that he was going to prefer new charges against Appellant.

As noted above, Lt Col MS discussed a variety of topics during the call, including his "NCO problem"—the recent poor behavior exhibited by some of the squadron's NCOs. In addition to Appellant's misconduct, one NCO had been found outside of a nightclub with twice the legal limit of alcohol in his system, another NCO had recently injured a junior airman while improperly operating a motorcycle, and multiple other NCOs had recently failed their physical assessments. Lt Col MS later testified:

> My goal [for the commander's call] was to get NCOs to start acting like NCOs, and other NCOs who were holding the line, to call the other NCOs out. They should be embarrassed when their NCOs are acting a certain way and giving their corps a bad name. Just like we get embarrassed when officers misbehave.

Lt Col MS explained that this was "a situation where my unit was suffering and members of my unit needed to understand that the team was on top of things."

During this discussion about NCOs who might be in trouble or in need, Lt Col MS tried to explain "the difference between supporting airmen and enabling airmen." He told the squadron that they needed to support their fellow airmen no matter what disciplinary or criminal process they might be going through. But Lt Col MS also cautioned his squadron that they shouldn't enable bad behavior, and offered two analogies to explain what he meant.

First, Lt Col MS presented the example of a fellow airman who suffers from alcohol or drug addiction. Lt Col MS highlighted the difference between supporting that person as they struggle with the problem versus enabling them by going to the liquor store and buying them the next bottle.

Second, Lt Col MS told a story about when he was an NCO and one of the junior airmen under his supervision was in the middle of Article 15, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 815 (2012), nonjudicial punishment pro-

ceedings for breaking curfew while deployed. The junior air-
man asked Lt Col MS to write a character statement on his
behalf, but Lt Col MS declined. Although we do not know ex-
actly how Lt Col MS described this incident during the com-
mander's call, he later testified about it before the trial court.
He said that he explained to the airman that he was " 'here to
support you' " and that the airman could " 'come talk to [him]
any time.' " But Lt Col MS also told the airman that he was
"not putting [his] name on a piece of paper for you telling the
commander that he should consider reducing the punishment
and not take stripes from you." Lt Col MS explained to the
junior airman that "[n]ot only did you disobey the order of the
mission commander, but I looked you in the eye and I told you
to make sure you are back on time. . . . You embarrassed eve-
rybody. You violated the order."

Lt Col MS testified that this story related to both his com-
mitment to support the junior airmen under his supervision
and his duty to the Air Force. With respect to the latter, he
stated that his then-commander would probably have ques-
tioned his judgment and his ability as an investigator if he
had chosen to write the character statement for the junior air-
man. He testified that he did not know if making the opposite
decision would have had a negative impact on his career, but
he conceded that he probably would not have been his com-
mander's investigator if he had advocated for not punishing
the junior airman who had diminished the good order and dis-
cipline of the unit.

During the commander's call, Lt Col MS did not connect
this story with the NCO issues then present in the squadron.
He did not mention Appellant or anyone else by name, or ref-
erence any specific incidents of misconduct or ongoing admin-
istrative or disciplinary actions. Other than the story about
the junior airman from earlier in his career, Lt Col MS testi-
fied that he did not mention character letters.

After the commander's call, a junior NCO who was Appel-
lant's friend asked to meet with Lt Col MS. This junior NCO
had previously given a statement to law enforcement saying
that he "thought that the unit and Air Force were after [Ap-
pellant] and [Appellant] wasn't that bad." During their ensu-
ing conversation, Lt Col MS reinforced his expectation that
the junior NCO should "support [Appellant] when he needs

something. Just do not enable him." Lt Col MS encouraged the junior NCO to contact Appellant's defense counsel, telling him, "[y]ou call the defense. . . . That's part of the process. You call them. They are going to interview you. All I ever expect anybody to do in this unit is just tell the truth."

On August 14, 2017, a week after the commander's call, Lt Col MS preferred new charges and specifications against Appellant for disobeying a lawful command, assault consummated by battery, aggravated assault, and communicating a threat, in violation of Articles 90, 128, and 134, UCMJ, 10 U.S.C. §§ 890, 928, 934 (2012). The trial on the merits in Appellant's subsequent court-martial began August 23, 2018, more than a year after the commander's call, and almost two months after Lt Col MS had changed duty stations to Joint Base Charleston, South Carolina.

Prior to his court-martial, Appellant filed a pretrial motion to dismiss all charges due to the appearance of unlawful command influence.[1] Appellant argued that Lt Col MS's message during the commander's call improperly influenced Appellant's court-martial by discouraging the squadron from writing character letters on his behalf. At the subsequent motions hearings, in addition to the testimony from Lt Col MS referenced above, both defense and trial counsel called airmen who were present at the commander's call to give their impression of the call. Their testimony demonstrated that different airmen came away with differing interpretations of the message that Lt Col MS was trying to convey.

Master Sergeant (MSgt) CP understood Lt Col MS's message to be support your fellow airmen, even if they are in trouble. Senior Airman (SrA) RE left the commander's call feeling that he was free to support anyone in the unit. Although he had the impression that writing a character letter for someone in trouble might "rub [Lt Col MS] the wrong way," he also

---

[1] Appellant's motion appeared to assert both unlawful command influence and the appearance of unlawful influence, seeking dismissal with prejudice of all charges pursuant to Article 37, UCMJ, "for actual and perceived unlawful command influence." Defense counsel later clarified before the military judge that Appellant was only asserting the appearance of command influence. Article 37, UCMJ, 10 U.S.C. § 837 (2012).

said that Lt Col MS's message was unclear and left "a lot of room for imagination." Ultimately, SrA RE made clear that he personally would not have any concern, based on the comments made at the commander's call, about writing a character letter for someone in trouble, although he might feel differently if he intended to stay in the Air Force for twenty years. SSgt AG recalled the message to be that airmen should rethink their position in the Air Force if they support certain individuals or NCOs. He went on to explain that he was confused by the message but felt that he could remain Appellant's friend, support Appellant, cooperate with Appellant's defense counsel, and if he chose, write a character letter on behalf of Appellant, without facing any repercussions.

The airmen's testimony from the motions hearing demonstrated that at least some airmen connected Lt Col MS's comments about supporting but not enabling their fellow NCOs to their own personal decisions about writing character letters on behalf of Appellant. Nevertheless, no airmen testified that Lt Col MS's comments caused any airman to change his mind about providing a character letter or otherwise assisting Appellant's defense.

At the conclusion of the hearings, the military judge denied Appellant's motion to dismiss the charges pursuant to Article 37, UCMJ, holding that Appellant had "not presented 'some evidence' beyond mere allegation or speculation that raises a claim of apparent [unlawful command influence] in the adjudicative stage." The military judge found that "the squadron commander addressed his unit at a commander's call regarding NCO misconduct in general, and at a time when the accused was no longer under preferred or referred charges, nor in pretrial confinement" and that "[t]here [was] no evidence before this court that witnesses once supportive of the accused, [had] since altered any prior promise of support." The military judge also found that there was no evidence that Lt Col MS "was trying to influence the outcome of a prospective court-martial involving the accused in either the finding or the sentencing stage."

A special court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of six counts of disobeying an order, one count of assault consummated by battery, and one count of wrongfully communicating

a threat, in violation of Articles 90, 128, and 134, UCMJ. Appellant was sentenced to a bad-conduct discharge, hard labor without confinement for three months, and reduction of grade to E-3.

On appeal, the AFCCA disagreed with the military judge and held that Appellant had satisfied his initial burden of showing "some evidence" of unlawful command influence.[2] 2020 CCA LEXIS 196, at *43, 2020 WL 2991773, at *14 (internal quotation marks omitted) (citation omitted). Nevertheless, the court then concluded that the Government had successfully rebutted the allegation of apparent unlawful command influence by proving beyond a reasonable doubt that no fully informed, disinterested, objective observer would doubt the fairness of Appellant's court-martial. *Id.* at *44, 2020 WL 2991773, at *15. The AFCCA based its conclusion on the facts that: (1) none of the witnesses understood Lt Col MS's commander's call message as one discouraging them from writing character letters for Appellant; (2) the court-martial occurred more than a year after the commander's call; (3) no airman testified that Lt Col MS would take any action

---

[2] More precisely, the AFCCA held that "Appellant met his initial showing of 'some evidence' of *apparent* UCI." *United States v. Proctor*, No. ACM S32554, 2020 CCA LEXIS 196, at *43, 2020 WL 2991773, at *14 (A.F. Ct. Crim. App. June 4, 2020) (unpublished). (emphasis added) (citation omitted); *see also id*. at *44, 2020 WL 2991773, at *15 ("Nonetheless, we conclude that the evidence of *apparent* UCI was rebutted by the Government's proof . . . ." (emphasis added)). The AFCCA's focus on evidence of *apparent* unlawful command influence at this initial stage was a mistake. As the AFCCA stated a few paragraphs earlier in the "Law" section of its opinion: "When an appellant asserts there was an appearance of unlawful command influence, the appellant initially must show 'some evidence' that unlawful command influence occurred." *Id.* at *41, 2020 WL 2991773, at *13 (alterations in original removed) (internal quotation marks omitted) (quoting *United States v. Boyce*, 79 M.J. 242, 249 (C.A.A.F. 2017)). In light of the fact that (1) we review the AFCCA's unlawful command influence analysis de novo, and (2) the AFCCA properly stated the law in the "Law" section of its opinion, we do not believe that the AFCCA's mistake raises any additional concerns. To avoid further confusion on this point, we treat the AFCCA's opinion as finding some evidence of actual rather than apparent unlawful command influence throughout this opinion.

against them for their participation in the court-martial; (4) there was no evidence that any airman refused to testify or write a character letter in support of Appellant; and (5) there was no evidence that a witness once supportive of Appellant later withdrew or changed any assurance of support. *Id.* at *43, 2020 WL 2991773, at *14.

We granted review of the following issue:

> At an all-call prior to Appellant's court-martial, Appellant's squadron commander sought to address his "NCO problem" by highlighting the negative career impacts someone could suffer if they provided a character letter for an accused airman. Did the Air Force Court err when it found, beyond a reasonable doubt, that this unlawful command influence did not place an intolerable strain on the public's perception of the military justice system?

*United States v. Proctor*, 80 M.J. 346–47 (C.A.A.F. 2020) (order granting review).

## II. Discussion

This Court reviews allegations of unlawful command influence, including allegations of the appearance of unlawful command influence, de novo. *United States v. Bergdahl*, 80 M.J. 230, 234 (C.A.A.F. 2020); *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018). We accept as true the military judge's findings of fact on a motion to dismiss for unlawful command influence unless those findings are clearly erroneous. *United States v. Stirewalt*, 60 M.J. 297, 300 (C.A.A.F. 2004).

Article 37(a), UCMJ, prohibits, in relevant part, any person subject to the Uniform Code of Military Justice from "attempt[ing] to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof, in reaching the findings or sentence in any case. *See* Rule for Courts-Martial (R.C.M.) 104(a) (2016).[3] This Court has previously recognized two types of unlawful command influence

---

[3] All references in this opinion to Article 37, UCMJ, are to the version of that article that existed prior to the enactment of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019). This opinion takes no stance as to what changes, if any, the 2019 amendments to Article 37, UCMJ,

that can arise in the military justice system: actual unlawful command influence and the appearance of unlawful command influence. *Bergdahl*, 80 M.J. at 234; *Boyce*, 76 M.J. at 247. Unlike actual unlawful command influence, a meritorious claim of the appearance of unlawful command influence does not require prejudice to an accused. *Boyce*, 76 M.J. at 248. Instead, the prejudice is what is done to the "public's perception of the fairness of the military justice system as a whole." *Id.* A significant factor in determining whether the unlawful command influence created an intolerable strain on the public's perception of the military justice system is whether the "appellant was not personally prejudiced by the unlawful command influence, or that the prejudice caused by the unlawful command influence was later cured." *Id.* at 248 n.5.

Under this Court's jurisprudence, an accused who asserts there was an appearance of unlawful command influence bears the initial burden of showing "some evidence" that unlawful command influence occurred. *Bergdahl*, 80 M.J. at 234 (internal quotation marks omitted) (citation omitted); *Boyce*, 76 M.J. at 249 (internal quotation marks omitted) (citation omitted). Although this is a low burden, the evidence presented by the Appellant to establish his prima facie case must consist of more than "mere allegation or speculation." *Bergdahl,* 80 M.J. at 234 (internal quotation marks omitted) (quoting *Boyce*, 76 M.J. at 249).

If the accused presents "some evidence" of unlawful command influence, "the burden shifts to the government to prove beyond a reasonable doubt that either: (a) the 'predicate facts proffered by the appellant do not exist,' or (b) 'the facts as presented do not constitute unlawful command influence.'" *Id.* (citation omitted). If the government fails to rebut the accused's factual showing, it may still prevail if it proves:

> [B]eyond a reasonable doubt that the unlawful command influence did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances,

require with respect to our appearance of unlawful command influence jurisprudence.

would not harbor a significant doubt about the fairness of the proceeding.

*Id*. (alteration in original removed) (internal quotation marks omitted) (citation omitted).

## A. Some Evidence

We conclude that Appellant established "some evidence" of unlawful command influence. Appellant argues that Lt Col MS improperly attempted to influence the outcome of Appellant's court-martial by discouraging the airmen in his squadron from supporting Appellant, either by writing character letters or testifying on his behalf. Although we do not know the precise details of what Lt Col MS said during his commander's call, the facts that are known are sufficient to establish a prima facie case that goes beyond mere allegation or speculation.

First, Lt Col MS stated that part of the reason he discussed his "NCO problem" on the call was because of Appellant's misconduct and other circumstances surrounding his case. As noted by the AFCCA, Appellant was among the unnamed NCOs who were the focus of Lt Col MS's remarks, something that members of the squadron who knew Appellant would recognize. *Proctor*, 2020 CCA LEXIS 196, at *37–38, 2020 WL 2991773, at *12–13. Although the original charges against Appellant had been dismissed without prejudice at the time of the commander's call, Lt Col MS knew that he was going to prefer new charges against Appellant, and in fact did so about a week later.

Second, it is undisputed that Lt Col MS told a story about his decision to do exactly what Appellant claims Lt Col MS wanted all of the airmen in the squadron to do: decline to write a character letter on behalf of a fellow airman facing disciplinary procedures. During the commander's call, Lt Col MS encouraged the squadron to support but not enable the members of their squadron—such as Appellant—who might be in trouble. The military judge concluded that these comments were not intended to discourage the airmen from providing character letters or testifying on Appellant's behalf. But Lt Col MS's intent could have been misunderstood, and the testimony from the motions hearing shows that at least some of the airmen in the squadron understood there to be a

nexus between Lt Col MS's remarks about not enabling NCOs who might be in trouble and assisting in their defense.

Finally, none of the airmen from Appellant's squadron participated on his behalf during the sentencing phase of his court-martial. Appellant offered four character letters, and four witnesses (including two former airmen who served alongside Appellant as security forces personnel at Schriever Air Force Base) testified on Appellant's behalf, but no member of Appellant's squadron provided a letter or testified.

Putting these facts together—Lt Col MS's comments about not writing a character letter, how some airmen understood those comments, and the lack of support for Appellant during sentencing from any of the airmen in his squadron—we agree that Appellant presents a plausible theory of unlawful command influence that rises beyond mere speculation. We therefore conclude that Appellant established "some evidence" of unlawful command influence.

## B. No Intolerable Strain on the Military Justice System

Once an appellant has shown "some evidence" of unlawful command influence, the government has three separate means of rebutting the accused's claim. Like the court below, we do not consider the first two—(1) that "the predicate facts proffered by the appellant do not exist," or (2) "the facts as presented do not constitute unlawful command influence"—because we conclude that the case can be resolved under the third. *Bergdahl*, 80 M.J. at 234 (internal quotation marks omitted) (quoting *Boyce*, 76 M.J. at 249). Despite there being some evidence of unlawful command influence, we are confident, beyond a reasonable doubt, that such influence "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding." *Id.* (alteration in original removed) (internal quotation marks omitted) (citation omitted). When we look at the record as a whole, we conclude that although some of Lt Col MS's comments during the commander's call may have been unwise—at least without additional comments that would have made it clear that he did not mean to suggest that

the airmen should not assist Appellant during his court-martial—"an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding." *Id.* (alteration in original removed) (internal quotation marks omitted) (citation omitted).

First, this is a case where Appellant's allegations of unlawful command influence were raised immediately and fully litigated by his defense counsel before the military judge. Lt Col MS conducted his commander's call on August 7, 2017. Less than three months later, on October 31, 2017, Appellant's defense counsel filed a motion seeking the dismissal of Appellant's charges pursuant to Article 37, UCMJ. The military judge conducted a motions hearing on August 20, 2018, providing Appellant with the opportunity to call witnesses and present evidence in support of his claim of unlawful command influence. Despite the fact that Appellant's defense counsel had ten months to prepare for the motions hearing, the record includes *no evidence* that any airman refused to testify or write a character letter in support of Appellant for sentencing. None of the witnesses at the hearing—including those called by Appellant—stated that Lt Col MS's comments changed their mind about supporting Appellant. In the absence of any direct evidence from the motions hearing that supports Appellant's assertion that Lt Col MS's comments during the commander's call discouraged his fellow airmen from supporting him (despite Appellant's obvious incentive to discover and present any such evidence), we do not believe that Appellant's speculation about why his fellow airmen declined to support him is sufficient to establish an "intolerable strain" on the military justice system.

Second, the alleged causal connection between Lt Col MS's comments at the commander's call and the level of support Appellant received from his squadron during his court-martial is tenuous at best. The commander's call was a regularly occurring event that had been scheduled months ahead of time, not a response to any of the events related to Appellant's misconduct. During the call, Lt Col MS never mentioned Appellant by name or specifically referenced any of his misconduct. And, as discussed above, Appellant was not the only

NCO in the squadron who was having problems. Neverthe-less, Appellant now asserts that Lt Col MS "intentionally set out to deter his subordinates from vocalizing support for Ap-pellant." But, the military judge expressly found that there was no evidence to support this allegation, a finding that we do not believe to be clearly erroneous. While it is true that Lt Col MS stated that he had Appellant's conduct in mind when discussing the squadron's "NCO problem," he also stated that Appellant's issues were only one part of a broader trend of NCO misconduct. Again, we find no reason to as-sume, absent any direct evidence, that the airmen in Appel-lant's squadron understood Lt Col MS's instruction to sup-port, but not enable their fellow airmen to be an order (or even a request or a suggestion) not to write a character letter on Appellant's behalf for a court-martial proceeding that would not take place until over a year later.

Third, we cannot disregard the fact that over a year passed between Lt Col MS's commander's call and the start of the trial on the merits in Appellant's court-martial, and that during that time Lt Col MS permanently relocated from Colorado Springs, Colorado to Charleston, South Carolina. He left the squadron on June 28, 2018, almost two months before the trial on the merits in Appellant's court-martial be-gan on August 23, 2018. Given the passage of time between the two events, the lack of any supporting evidence, and the fact that Lt Col MS had permanently departed from Appel-lant's squadron months before Appellant's court-martial be-gan, we cannot conclude that Lt Col MS's comments pre-vented any airmen from writing Appellant a character letter who otherwise intended to do so.

Finally, we underscore that there is no reason to believe anything said by Lt Col MS had an effect on the outcome of this case. Appellant only alleged the appearance of unlawful command influence at the sentencing phase, so there is no reason to question his findings of guilt. And during the sen-tencing phase, it is not the case that Appellant had no sup-port. Four people wrote character letters on Appellant's be-half, and four witnesses testified on his behalf during the sentencing phase. Two of those witnesses were former secu-rity forces personnel who served with Appellant at Schriever

Air Force Base, exactly the kind of witness that Appellant asserts that he was denied by Lt Col MS's comments.

Although Appellant argues that his ability to present his sentencing case was hindered, the panel gave Appellant much of what his defense counsel asked for during sentencing. Appellant faced a maximum sentence of one year confinement, two-thirds forfeiture of pay for a year, reduction to E-1, and a bad-conduct discharge. Appellant's defense counsel urged the panel to reject confinement, telling them that it "accomplishes nothing" and suggesting alternatives such as confinement to base and hard labor. The panel apparently agreed, declining to sentence Appellant to any form of confinement. The panel also rejected the Government's requests for forfeitures and to take all of Appellant's stripes. In the end, the panel sentenced Appellant to hard labor without confinement for three months, reduction of grade to E-3, and a bad-conduct discharge.

In light of these facts, we conclude that there would be no basis for an impartial observer to believe that Appellant's sentence was affected by Lt Col MS's statements during the commander's call or was otherwise unfair.

### III. Conclusion

Deciding whether some evidence of unlawful command influence created an intolerable strain on the public's perception of the military justice system is a fact-intensive inquiry. Here, based on the totality of the circumstances, and in the absence of any evidence that an airmen's decision to support or not support Appellant was affected by Lt Col MS's comments, we conclude, beyond a reasonable doubt, that "an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding." *Bergdahl*, 80 M.J. at 234 (alteration in original removed) (internal quotation marks omitted) (quoting *Boyce*, M.J. 76 at 249). Accordingly, we affirm the decision of United States Air Force Court of Criminal Appeals.

Chief Judge STUCKY, with whom Judge OHLSON joins, dissenting.

I agree with the majority that Appellant successfully raised "some evidence" of unlawful influence. I part ways, however, with their conclusion that a fully informed observer would not harbor significant doubt about the fairness of Appellant's sentencing proceeding.

Appellant's squadron commander, Lieutenant Colonel (Lt Col) MS explicitly drew a connection between airmen writing a letter in support of a troubled noncommissioned officer (NCO) and the trajectories of their own careers, and multiple members of Appellant's unit questioning their futures in the Air Force if they wrote such letters for Appellant. Since the Government failed to make an effort to cure this message or show that no witnesses were dissuaded from testifying, Appellant has established the appearance of unlawful influence, and I would reverse.

Depriving an accused of favorable character witnesses can constitute unlawful influence. *See United States v. Thomas*, 22 M.J. 388, 396–97 (C.M.A. 1986). In *Thomas*, at multiple briefings with his subordinates, a major general stated his displeasure with commanders who, after recommending that an accused be tried by "a court-martial authorized to adjudge a punitive discharge," nonetheless testified to the accused's character and recommended the convicted soldier remain in the army. *Id.* at 391–92. Our predecessor Court determined that the commander's comments "were later interpreted, or misinterpreted, to reflect an intent that [anyone] from an accused's unit[] should not give favorable presentencing testimony on behalf of an accused." *Id.* at 392. As a result, the Court decided that the comments amounted to unlawful influence. I believe a similar "interpretat[ion], or misinterpretat[ion]" happened here.

Lt Col MS admitted that he had Appellant in mind when he made the statements at issue during the commander's call and that he "felt like [he] had to talk about things without talking about them." Apparently, the timing of these comments led several of his NCOs to also believe Lt Col MS's comments were targeting Appellant's situation.

Lt Col MS's general message was to "support, but do not enable" fellow airmen. He told a story, chronicling his own experiences as a staff sergeant (SSgt). He confessed that he had declined to provide a character letter for another airman because of what he perceived to be his duty to the Air Force, and the negative consequences that could follow from "sticking [his] neck out there" for someone in trouble. He indicated that had he done so, his commander would have "question[ed] [his] judgment" and might have declined to send him to military police investigator school.

Lt Col MS drew a line between what he considered acceptable and unacceptable conduct and, as an example of this distinction, he told a story about when *he did not write a character letter* for a fellow airman. He explained how writing one could have had negative consequences for his job and his competency in the eyes of his commander.

But Lt Col MS also made this association explicit in connection with support for Appellant. During the investigation of Appellant, SSgt MJ made a statement to law enforcement that "he thought that the unit and the Air Force were after [Appellant] and he wasn't that bad." When he read this comment, Lt Col MS asked another NCO, "Sergeant, what's going on with [SSgt MJ]? I mean, he's one of my best NCOs. In fact, just this morning I just signed a letter of recommendation for him to go be an FTAC guy,[1] and it kind of just shocked me that I read that." Lt Col MS admitted that this "probably got back" to SSgt MJ. SSgt MJ expressed no more support for Appellant and even avoided trial defense counsel's calls.

At least one NCO thought the takeaway of the commander's call was, "[i]f you're supporting an NCO that's in trouble, you might want to rethink your career. . . . then it might put you in a negative light also, or you might be looked at as the problem." Senior Airman RE stated that if he were

---

[1] An FTAC is a First Term Airmen Course representative who helps airmen arriving from technical school transition to the operational Air Force. U.S. Air Force, *First Term Airmen Courses receive curriculum overhaul,* https://www.af.mil/News/Article-Display/Article/1185635/first-term-airmen-courses-receive-curriculum-overhaul/ (last visited June 2, 2021).

planning on staying in the Air Force for twenty years (as opposed to the one year and nine months remaining on his enlistment), then he would rethink whether to write a character letter for Appellant, as he "wouldn't want to rub my leadership the wrong way."

This is problematic. These NCOs expressed a belief that those in power might look unfavorably on them if they wrote a letter in support of Appellant. As Lt Col MS explained, their careers might be affected if they "[stuck their] neck[s] out" for an airman in trouble. And what constituted "sticking your neck out"? Writing a character letter.

Additionally, SSgt AG testified that though he did not "feel like he could not write, if asked, a character letter for [Appellant]," he nevertheless "walked away from [Lt Col MS's commander's call] believing that [Lt Col MS] was saying that if you supported an airman or NCO such as [Appellant] who is facing a court-martial then you needed to rethink your choice of serving in the United States Air Force." He clarified to the military judge that his takeaway from the call was that "support of airmen such as [Appellant] should indicate a reflection of your career." He stated that he did not fear *punishment*, but that if they supported Appellant, they "should rethink their career choice." SSgt AG also indicated that multiple times he asked if Lt Col MS would be in the room when he testified, as "it's a little hard to say what I say *when there's somebody in a position of power over me specifically in that room.*" (Emphasis added.)

Finally, the mere absence of Lt Col MS from the unit at the time of sentencing is not enough, in my mind, to cure the damage. As detailed above, several NCOs believed that a commander might look unfavorably on a character letter for a troubled airman. Their whole concept of what is appropriate in the Air Force was tainted by that commander's call. It wasn't just that Lt Col MS might punish them—but that if they dared to write a letter, it reflected poorly on their fitness for duty. Indeed, if they wrote a letter, they might want to rethink their career; the subtext being that good NCOs do not "stick[ their] neck[s] out" for those in trouble. Desiring to be good NCOs, it is understandable that no one who was at the commander's call wrote a letter.

The majority recognizes that "a meritorious claim of the appearance of unlawful command influence does not require prejudice to an accused. Instead, the prejudice is what is done to the public's perception of the fairness of the military justice system as a whole." *United States v. Proctor*, __ M.J. __, __ (9) (C.A.A.F. 2021) (internal quotation marks omitted) (citations omitted). Nevertheless, it implies Appellant failed to carry his burden because he was unable to produce any evidence that any airman had refused to testify or provide a character statement. I believe this misstates the burden of proof.

> Once the accused meets the "some evidence" threshold, the burden shifts to the government to prove beyond a reasonable doubt that either: (a) the predicate facts proffered by the appellant do not exist, or (b) the facts as presented do not constitute unlawful command influence. If the government cannot succeed at this step, it must prove beyond a reasonable doubt that the unlawful command influence did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would *not* harbor a significant doubt about the fairness of the proceeding.

*United States v. Bergdahl*, 80 M.J. 230, 234 (C.A.A.F. 2020) (alteration in original removed) (internal quotation marks omitted) (citation omitted). It is the Government's duty to prove beyond a reasonable doubt that that an objective, disinterested observer would not harbor significant doubt about the fairness of the proceedings. This the Government failed to do.

Moreover, Appellant has presented significant indirect evidence of the chilling effect of Lt Col MS's words. Appellant received favorable witness testimony from members of other units, but *none* from his current unit—even those who had expressed support for him earlier in the court-martial process. Multiple members of Appellant's current unit testified that they were concerned with how support for Appellant would reflect on their career. While they thought they *could* testify for Appellant, I am concerned with the lingering effects of Lt Col MS's words, and more importantly, with the strain

they put on the public's perception of the military justice system. Lt Col MS indicated that *whom* the NCO's offer character letters for reflected on *their own fitness and character.*

Even though the sentencing proceeding did not take place until a year after Lt Col MS's statements, the Government has not shown that the effect of his words had diminished or that he or anyone did anything to ameliorate the effect of his words on his squadron.[2] By connecting his NCOs' support of Appellant to their fitness for duty, Lt Col MS interfered with Appellant's ability to produce favorable sentencing witnesses from his current unit. The Government failed to prove beyond a reasonable doubt that this interference did not put an intolerable strain on the public's perception of the military justice system and amount to apparent unlawful influence. Therefore, I respectfully dissent.

---

[2] The majority states, "The military judge conducted a motions hearing on August 20, 2018, providing Appellant with the opportunity to call witnesses and present evidence in support of his claim of unlawful command influence." *Proctor*, __ M.J. at __ (12). However, the military judge issued her unlawful command influence ruling in February 2018. There is no indication in the joint appendix or the parties' briefs that the military judge revisited the unlawful command influence issue in August 2018.